UNITED STATES of America, Plaintiff-Appellee,

v.

Gilbert L. DOZIER, Defendant-Appellant.

No. 80–3927.

United States Court of Appeals, Fifth Circuit.

April 8, 1982.

Camille F. Gravel, Jr., Helen G. Roberts, Alexandria, La., William H. Jeffress, Jr., Washington, D.C., for defendant-appellant.

Mitchell B. Lansden, Ian F. Hipwell, Donald L. Beckner, U. S. Atty., Baton Rouge, La., for plaintiff-appellee.

Before WISDOM, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge.

Gilbert L. Dozier was elected Commissioner of Agriculture of the State of Louisiana on December 13, 1975, and took office on May 10 of the following year. His bid for reelection in December, 1979, conducted in the midst of a publicized federal investigation of his activities as Commissioner, was unsuccessful. In January, 1980, a federal grand jury returned a five-count indictment against Dozier.

Count One charged that Dozier had violated the Racketeer Influence and Corrupt Organization (RICO) statute, 18 U.S.C. § 1962(c) by conducting the affairs of the Louisiana Department of Agriculture—an "enterprise" within the meaning of 18 U.S.C. § 1961(4)—through a pattern of racketeering activities. In all, Count One described twelve separate acts of racketeering that Dozier allegedly had committed between December 1975 and October 1979. Each allegation depicted Dozier's solicitation of money from a person or business that was or might have been affected by some action of the Louisiana Department of Agriculture. Briefly, the twelve allegations, designated by letters in the indictment, were as follows:

(A) That Dozier, in August 1978, attempted to solicit $10,000 from Edward Simpson, owner of a livestock auction barn, in return for providing a charter through the Livestock Charter Commission and Sanitary Board;

(B) That Dozier, in November 1978, extorted $10,000 from Floyd "Shorty" Giles by promising to deliver an auction barn charter;

(C) That Dozier, in early 1976, attempted to extort $200,000 from Louisiana milk processors through Temple Brown, president of Brown's Velvet Dairy, in return for a promise to lower the price of milk;

(D) That Dozier, in May 1976, extorted $4,900 from Walter Davis by promising to provide a pesticide license;

(E) That Dozier, in August 1979, attempted to extort $20,000 from Alvin "Bugs" Burger, owner of a pest control company, in return for using his influence with the Louisiana Structural Pest Control Commission, which had questioned Burger's ability to supervise his Louisiana concerns while residing in Florida;

(F) That Dozier, in July or August 1979, threatened the owner of an aerial crop dusting service, Roy True, with shutdown unless True paid him $2,000;

(G) That Dozier, in April 1978, asked James Pruitt for $10,000 in return for securing him a seat on the Louisiana State Market Commission;

(H) That Dozier, from January to May 1977, attempted to extort $25,000 from Nicholas Fakouri and the Vermillion Dairymen's Cooperative Association in return for a loan guarantee from the State Market Commission;

(I) That Dozier, from January to September 1976, attempted to solicit a kickback of $10,000 from consultants Burk & Associates in return for contracts on a proposed New Orleans Food Distribution Center;

(J) That Dozier, from January to September 1976, attempted to extort $20,000 from the Louisiana Computer Company in return for favorable treatment from the state;

(K) That Dozier, throughout 1976, attempted to solicit $1,000 from each member of the Louisiana Livestock Market Association in return for a promise to restore state-compensated private veterinarians to the auction markets and to raise the fees charged by the markets on tests for cattle brucellosis;

(L) That Dozier, in March 1976, accepted a bribe of $2,000 from John Lambert in return for promising to help Lambert obtain a job in the Department of Agriculture.

Count One also designated eleven of these twelve incidents (paragraphs A through K, *supra*) as violations of the Hobbs Act, 18 U.S.C. § 1951, and the Loui-

siana bribery statute, La.Rev.Stat.Ann. § 14:118 (West 1974 & Supp. 1981). One incident (paragraph L) was alleged only as a violation of the state bribery statute. Finally, Counts Two through Five isolated four of these alleged transactions (paragraphs B through E, *supra*) as separate offenses under the Hobbs Act.

The trial began on September 2, 1980. On September 23, the jury returned a verdict finding Dozier guilty on all counts except Count Four. The district court denied Dozier's motions for judgment of acquittal and for a new trial. On November 7, the court sentenced Dozier to five years imprisonment and a fine of $25,000 for the RICO conviction (Count One), to a consecutive five-year term of imprisonment on Count Two, and to five years of probation on Count Three. The court suspended the imposition of sentence on Count Five and, as to imprisonment only, on Count Three.

Dozier maintained throughout his trial that his various solicitations were nothing more than the ordinary fundraising activities of a public official faced with the financial burdens of electioneering. Pursuing this theme on appeal, Dozier contests the applicability of both RICO and the Hobbs Act to facts adduced by the government. Interspersed with these matters of statutory construction are protests regarding some of the court's rulings and its instructions to the jury. Having reviewed Dozier's arguments with care, we believe that the convictions must stand on every count. In giving our reasons, we will address these contentions in the order presented by the appellant.

I. Is the Hobbs Act Unconstitutionally Vague as Applied to Elected Officials?

The Hobbs Act prohibits the obstruction of commerce by extortion, which it defines as "the obtaining of property from another, with his consent, induced by wrongful use or actual or threatened force, violence, or fear, or *under color of official right.*" 18 U.S.C. § 1951(b)(2) (emphasis supplied). Only last year we joined eight other circuits in holding "that Hobbs Act violations based on extortion by a public official need not include proof of threat, fear, or duress." *United States v. Williams*, 621 F.2d 123, 124 (5th Cir. 1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1366, 67 L.Ed.2d 346 (1981). Our decision in *Williams* reinstated a jury verdict convicting an elected school board member who had solicited and received airline tickets and cash from a contractor doing business with the school board. In so doing, we overturned the district court's conclusion that the phrase "obtaining ... under color of official right" is unconstitutionally vague.

Dozier necessarily concedes, therefore, that application of the Hobbs Act to punish solicitation of funds by an elected official is established precedent in this circuit. He seeks to distinguish *Williams*, however, by pointing out that the school board member convicted in that case made no attempt to characterize or explain his "donations" as legitimate political contributions. Dozier further submits that our rejection of the facial constitutional challenge posed in *Williams* does not preclude a holding that the Act's language is unconstitutionally vague *as applied* to an elected official confronted by the recurrent need to solicit and accept campaign contributions. As written and as previously interpreted,[1] Dozier continues, the Act's injunction against taking money "under color of official right" provides no guidelines or protection for innocent fun-

---

1. Dozier particularly attacks this court's language in *Williams* affirming the jury's conviction of an official because he "accepted money and gratuities, knowing he was not entitled to them in the discharge of his lawful duties, and that payment was induced by his official position." 621 F.2d at 126. Dozier maintains that campaign contributions necessarily are induced by an elected official's position and that politicians are never "entitled" to donations. As

Dozier himself points out, however, we were not addressing the problem of fundraising in *Williams* and did not intend, therefore, for the quoted phrase to serve as a well-chiseled standard in that context. This does not mean that the boundary between legal fundraising and extortion "under color of official right" is not discernible from the language and judicial history of the Act, as explained *infra*.

draising and can only exert a chilling effect on this constitutionally protected activity.

The Supreme Court has recognized the important function of financial contributions in expressing support for candidates and fueling political debate. *E.g., Buckley v. Valeo,* 424 U.S. 1, 21, 96 S.Ct. 612, 635, 46 L.Ed.2d 659 (1976); *Citizens Against Rent Control v. City of Berkeley,* —— U.S. ——, ————————, 102 S.Ct. 434, 435–436, 70 L.Ed.2d 492 (1981). Moreover, as Dozier is quick to point out, commentators and judges have expressed concern lest overzealous but unwitting fundraisers be swept up in a net originally intended for the truly venal. Criticizing a Second Circuit decision applying the Hobbs Act against a Commissioner of Public Works who had demanded campaign contributions from an engineering firm under contract to his department, one writer has observed:

> [I]f a public official who asks for a political contribution from one who does, or may do, business with the government can be prosecuted on proof of those facts alone, then the Hobbs Act has become an extraordinary mechanism for controlling political activity on the state and local levels. . . . If [*United States v. Trotta,* 525 F.2d 1096 (2d Cir. 1975), *cert. denied,* 425 U.S. 971 [96 S.Ct. 2167, 48 L.Ed.2d 794] (1976)] means that a local government official commits extortion by soliciting a contribution from an organization that has or might have contacts with his agency, and is thereby liable to be imprisoned for twenty years, one may well ask whether a governor who attends a fundraising dinner and solicits contributions from the businessmen present has committed a felony.

Ruff, *Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy,* 65 Geo.L.J. 1171, 1196 (1977) (quoted in *United States v. Cerilli,* 603 F.2d 415, 437 (3d Cir. 1979), *cert. denied,* 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980) (Aldisert, J., dissenting)). *See also Williams, supra,* 621 F.2d at 126 (Tate, J., concurring).

Despite the reasonableness of these apprehensions, we remain unpersuaded that the Hobbs Act, as previously interpreted by this and other courts, discourages legitimate requests for political contributions. Our need to avoid hampering honest candidates who must solicit funds from prospective supporters· does not require that the courts abandon this necessary, if troublesome, realm of political maneuver to those who would abuse its opportunities. A moment's reflection should enable one to distinguish, at least in the abstract, a legitimate solicitation from the exaction of a fee for a benefit conferred or an injury withheld. Whether described familiarly as a payoff or with the Latinate precision of *quid pro quo,* the prohibited exchange is the same: a public official may not demand payment as inducement for the promise to perform (or not to perform) an official act.

In practice, of course, the fundraising defense makes detection of impropriety more difficult. Demands for money by an unelected official may constitute extortion *per se* ; the latent power of office ordinarily is sufficient to taint such demands as coercive. *See, e.g., United States v. Hathaway,* 534 F.2d 386, 393 (1st Cir. 1976), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976) (permitting conviction, without proof of duress, of Executive Director of municipal Redevelopment Authority who demanded kickbacks from construction contractors). Where the accused is or was an elected official authorized under our system to solicit contributions, however, a fine line may separate a request for support from the sale of a favor. As a sister court has observed, "No politician who knows the identity and business interests of his campaign contributors is ever completely devoid of knowledge as to the inspiration behind the donation." *United States v. Brewster,* 506 F.2d 62, 81 (D.C.Cir.1974). Consequently, we do not seek to punish every elected official who solicits a monetary contribution that represents the donor's vague expectation of future benefits. We must, nevertheless, discover and penalize those who, under the guise of requesting "donations," demand money in return for some act of official grace.

The demanding of specific contributions in return for specific actions for which the jury convicted Dozier well exemplifies this type of political misconduct. To give as examples only the first two violations alleged in the indictment, the government produced evidence to show that Dozier asked for ten thousand dollars in return for granting a charter to the owner of a livestock auction barn. Loy Weaver, who represented owner Edward Simpson in the charter negotiations, testified that Dozier boasted of his control over the Livestock Sanitary Board, which approves such charters: "If I say issue a charter, they are going to issue a charter." After closeting himself and Weaver, Dozier said that he would help Simpson, continuing "I'm in a position to help these people and they're able to help me. And this is politics. I want their help." Dozier eventually made his request more specific: "Well, Mr. Simpson is able to help me.... I think he ought to give me five thousand dollars and his old daddy ought to give me five." While Dozier quickly denied Weaver's protest that he was "putting a fee" on his help, the implication was clear. Simpson eventually received his charter, as well as a phone call from Dozier asking for the money. After Simpson had decided not to send the money, he learned that the livestock board had docketed a hearing on a proposed charter for a rival barn that would greatly decrease the value of his charter.

The rival charter application had been submitted by a group including Floyd Giles, a former Simpson employee. Giles had compiled a record of health violations while operating the auction barn for prior owners, and Dozier had conditioned his agreement to provide a charter on Simpson's discharge of Giles. Giles testified, however, that Dozier later denied responsibility for the firing and offered to help Giles. This help took the form of agreeing to deliver a charter to Giles and his friends in return for twenty thousand dollars. As Giles put it, "[Dozier told] me to bring him twenty thousand dollars. I asked him about ten. How about me just bringing you ten thousand dollars and give you the other ten thousand when

you give me that charter." He said: "I'll go along with that." The charter was not forthcoming, however, because Simpson threatened to publicize Dozier's demands for money and the hearing on Giles' charter never occurred. While Dozier had promised Giles his money back if he failed to obtain the charter, Giles never saw the money again. When pointedly asked by the prosecutor whether his money had been a campaign contribution, Giles responded "Call it no campaign. It was twenty thousand dollars for a livestock charter; and I give him half of it then and was going to give him the other half when I got the charter."

In each instance of misconduct alleged in the indictment, the scenario was roughly the same. Someone would solicit Dozier's aid as Commissioner—assistance in dealing with a state agency, appointment to a state board, a state contract or loan guarantee—and Dozier would name his price. On the basis of many accounts like those of Simpson and Giles, a jury convicted Dozier of wrongfully obtaining or attempting to obtain money "under color of official right."

■■ Yet Dozier complains that the language and prior interpretations of the Hobbs Act do not give "a public official of ordinary intelligence" an adequate description of the conduct proscribed. We find this impossible to accept. In *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32, 83 S.Ct. 594, 597, 9 L.Ed.2d 561 (1963), the Supreme Court observed:

The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.... Indeed, we have consistently sought an interpretation which supports the constitutionality of legislation.... In determining the sufficiency of the notice a statute must of necessity be examined in the light of the conduct with which a defendant is charged.

Of course, we are mindful that a stricter insistence upon clarity is necessary whenever a criminal statute's "margin" may fade into areas protected by the First Amendment. *E.g. Smith v. Goguen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974) (state criminal statute proscribing "contemptuous treatment" of American flag void for vagueness); *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (city ordinance prohibiting person from making disruptive noise while on ground adjacent to school in session not unconstitutionally vague or overbroad). Still, we remain unconvinced that we will create a snare for the innocent or discourage legitimate fundraising by extending Hobbs Act sanctions to an elected official who conditioned performance of official acts on the payment of fees in the name of contributions. When we evaluate "the sufficiency of the notice" afforded Dozier by the Act "in the light of the conduct" with which he is charged, his sales of influence do not qualify as marginal.

As we observed in *Williams, supra*, 621 F.2d at 125, "[i]t cannot be gainsaid that the statute on its face encompasses bribery of a public official, and that 'under color of official right' has a 'meaning, as a legal term of art, [that] is well-defined.'"[2] (Quoting *United States v. Trotta*, 525 F.2d 1096, 1100 (2d Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). That term of art comes down to us from the common-law crime of extortion, which consisted of "the corrupt taking of a fee by a public officer, under color of his office, where no fee is due, or not so large a fee is due, or the fee is not yet due." W. LaFave & A. Scott, *Handbook on Criminal Law*, 704 (1972).

If this technical meaning of the Act is inadequate to apprise an official of ordinary mental competence that he may not demand or accept money in return for requested exercises of his official power, judicial elaborations offer assistance. Perhaps most helpful is *United States v. Braasch*, 505 F.2d 139 (7th Cir. 1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975), which, while not involving an elected official, placed the following gloss on section 1951:

> The use of office to obtain payments is the crux of the statutory requirement of "under color of official right", and appellants' wrongful use of official power was obviously the basis of this extortion.... *It matters not whether the public official induces payments to perform his duties or not to perform his duties, or even, as here, to perform or not to perform acts unrelated to his duties which can only be undertaken because of his official position. So long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U.S.C. § 1951.* That such conduct may also constitute "classic bribery" is not a relevant consideration.

*Id.* at 151. (Citation and footnote omitted) (emphasis added).

Certainly the application of the Hobbs Act to the type of conduct described in *Trotta, supra*, and *United States v. Mazzei*, 521 F.2d 639 (3d Cir. 1975), *cert. denied*, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975), both decided over six years ago, should have notified any official wishing to skirt the borders of legality that any hint of a *quid pro quo* in soliciting political funds is a dangerous business. The *Mazzei* Court found that a state legislator had violated the Hobbs Act by demanding kickbacks, payable to a "Senate Finance Re-election Committee" from a business that leased office space to the state. After reviewing evidence that the Senator had required lessors to pay ten percent of the lease value into this "re-election" fund, the court concluded "that the evidence ... justified a

---

**2.** We also relied in *Williams*, 621 F.2d at 125, on the Supreme Court's decision in *United States v. Culbert*, 435 U.S. 371, 98 S.Ct. 1112, 55 L.Ed.2d 349 (1978), in which the Court stated that Congress has "conveyed its purpose clearly" in the Hobbs Act and had "intended to make criminal all conduct within the reach of the statutory language." *Id.* at 380, 98 S.Ct. at 1117.

finding that the payments to defendants were induced by an exploitation of [the lessor's] reasonable belief that defendant's position as a state senator provided him with effective control over the state leases here involved . . . ."[3] 521 F.2d at 645. *Trotta*, of course, added the broader interpretation that the benefit exchanged for the extorted fee need not be specific: "Such a *quid pro quo* may, of course, be forthcoming in an extortion case, or it may not. In either event, it is not an essential element of the crime." 525 F.2d at 1100.

We need not even come near to the broader interpretation of the Second Circuit in *Trotta* to place Dozier's misconduct well within the contours of the Act. *Trotta*, who demanded money from a contractor subject to his influence without specifically identifying the benefit to be conferred, may have been operating on the margin of the law; Dozier, who demanded specific amounts of money for specific favors, clearly was not.[4] He cannot complain, therefore,

that extension of the Act to circumstances like those presented in *Trotta* may make difficult identification of the Act's outer bounds. Since Dozier's conduct "falls squarely within the 'hard core' of the statute's proscriptions," *see Broadrick v. Oklahoma*, 413 U.S. 601, 608, 93 S.Ct. 2908, 2914, 37 L.Ed.2d 830 (1973), we adopt the solution of Justice Holmes in *United States v. Wurzbach*, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508 (1930): "[I]f there is any difficulty, which we are far from intimating, it will be time enough to consider it when raised by some one whom it concerns."[5]

■ At the very least, elected officials are, and have been, on notice that any public officer, elected or otherwise, who makes performance (or nonperformance) of an official act contingent upon payment of a fee—whether or not the fee actually is paid or the act actually performed—is guilty of extortion "under color of official right."[6] Dozier's vagueness challenge must fail.

3. More recently, the Third Circuit applied the Hobbs Act to another corrupt leasing scheme. In *United States v. Cerilli*, 603 F.2d 415 (3d Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 728, 62 L.Ed.2d 728 (1980), officials of the Pennsylvania Department of Transportation had demanded kickbacks from equipment lessors doing business with the state. Rejecting the defendants' excuse that the payments were political contributions and that "the solicitation of political contributions is not only lawful, but is protected by the First Amendment," *id.* at 418, the court concluded that their conduct "constituted extortion regardless of whether the payments went into appellants' pockets or their party's coffers." *Id.* at 420. While the court thus held that "the *coercive* solicitation of political contributions is within the realm of actions that are illegal under the Hobbs Act," *id.* at 421 (emphasis added), it is apparent from the court's brief recital of the facts that it was referring to an ordinary *quid pro quo*: "[T]he defendants required that payments be made as condition to the lessor's equipment being used." *Id.* at 418.

4. Trotta challenged his conviction under the Act by charging that the indictment was defective "because of its failure to allege 'a specifically identifiable misuse of office,' in which Trotta engaged, as an unlawful *quid pro quo* for a consideration in the nature of official action running from Trotta to [the contractor] in return for the payment of the money not lawfully owed." 525 F.2d at 1100. Dozier cer-

tainly cannot complain of any similar lack of specificity in his indictment, which was rife with "specifically identifiable" *quid pro quos.*

5. Quoted in *Broadrick, supra*, 413 U.S. at 609, 93 S.Ct. at 2914. Similarly, we are unimpressed with the argument that our action may "chill" legitimate solicitation. Certainly the last ten years of constant litigation in this area does not appear to have produced such paralysis. In any event, we cannot exonerate Dozier for his obviously improper conduct on such an extremely tenuous possibility. As the Court stated in *Broadrick*, in upholding a state statute challenged for vagueness and overbreadth by one whose conduct it clearly proscribed, "there comes a point where that [chilling] effect—at best a prediction—cannot, with confidence, justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe." 413 U.S. at 615, 93 S.Ct. at 2917–2918.

6. Contrary to Dozier's contention, moreover, we find that the trial court's jury instructions on the Hobbs Act "fairly and adequately cover[ed] the issues presented." *United States v. Pool*, 660 F.2d 547, 558 (5th Cir. 1981). The court defined extortion "under color of official right" as follows:

Extortion under the color of official right is the wrongful taking by a public officer of

## II. Was the Jury Adequately Instructed on the Difference Between Fundraising and Extortion or Bribery?

Dozier attacks as reversible error the trial court's refusal to adopt a number of proposed instructions elaborating on the difference between legitimate fundraising and criminal extortion or bribery. We recently summarized our standard for reviewing such allegations as follows:

> The trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented.... Equally important, the propriety of a given instruction, or the failure to give a particular instruction, is not received in the abstract; rather, the adequacy of the entire charge taken in the context of the whole trial is our proper scope of inquiry.

*United States v. Pool*, 660 F.2d 547, 558 (5th Cir. 1981) (citations omitted). *See also United States v. Ruppel*, 666 F.2d 261 at 273 (5th Cir. 1982); *United States v. Kerley*, 643 F.2d 299, 303 (5th Cir. 1981). Our review of the entire charge in its trial context convinces us that Dozier's challenges lacked merit.

■ First, he contends that the court erroneously rejected an instruction explaining that an official's solicitation of contributions from a person or business subject to his regulation is not unlawful in itself. This instruction was unnecessary, however, since the court told the jury that "[t]he solicitation of campaign contributions from *any person* is a necessary and permissible form of political activity on the part of persons who seek political office and persons who have been elected to public office" (emphasis added). Having instructed the jury that "any person" is a legal target for the political fundraiser, the court did not need to inform the jury further that "persons whose financial interests are or might be affected" are a species of "person."

■ Dozier next submits that the court's instructions on the Hobbs Act left the jury without any guidance as to what is a lawful political solicitation. Inviting us to take judicial notice of the "profound mistrust" that large donations arouse in the minds of many, Dozier asks for a reversal on grounds that the trial court failed to tell the jury that the law does not restrict the size of contributions and that officials may solicit funds, while still in office, for a variety of legitimate purposes. These contentions are groundless. The court specifically instructed the jury that "persons who have been elected" may solicit funds. More important, the court correctly instructed the jury, as we already have noted, regarding the type of conduct *prohibited* by the Act. It was not then incumbent upon the trial judge to enumerate every type of activity that remained permissible.

Finally, Dozier complains that the court erroneously instructed the jury on the relevance of the donor's intent under both the Hobbs Act and the Louisiana bribery statute. The trial court's Hobbs Act instruction required conviction on a showing that the defendant "knowingly and willingly" induced the named persons to part with property by means of extortion. He attacks this instruction on the basis of *United States v. Brewster*, 506 F.2d 62 (D.C. Cir. 1974). Reliance upon *Brewster* is misguided. *Brewster* grew out of an alleged infraction of the federal Bribery of Public Officials and Witnesses statute, 18 U.S.C. § 201(c)(1). The instruction disapproved in that decision permitted conviction on a showing that the public official's acceptance of money "was done for or because of acts to be performed by him in his official capacity, and was done *willfully and knowingly* rather than by mistake or accident." 506 F.2d at 81. Suggesting that every politician possesses some "knowledge" of the

---

money or property not due him or his office, whether or not the taking was accomplished by force, threats, or use of fear. In other words, the wrongful use of otherwise valid official power may convert dutiful actions into extortion. So, if a public official threat-

ens to take or withhold official action for the wrongful purpose of inducing a victim to part with property, such a threat would constitute extortion, even though the official was already duty bound to take or withhold the action in question.

self-serving expectations that accompany many financial contributions, the court found it improper to hold a public official responsible for *knowing* the motive of a contributor. *Id.*

██ The case before us, by contrast, involves an extortion charge. The emphasis is on the defendant's own motives rather than on his perception of a potential contributor's motive. The issue is whether Dozier "knowingly and willingly" induced some of his constituents to pay him money by threatening to take or withhold official action, not whether he accepted money as contributions with "knowledge" of a donor's corrupt intent. Under these circumstances, the trial court's instruction on knowing and willful inducement, coupled with its already approved definition of extortion, adequately presented to the jury the elements of this crime.

██ Dozier's complaint regarding the instructions on the Louisiana bribery statute is similarly groundless. The court charged the jury that its inquiry under the state bribery law was "whether the political contribution is made or solicited not as *quid pro quo* for specific action, but with the intent to influence the conduct of the public servant in relation to his position, employment or duty." According to Dozier, this wording focused the jury's intention on the *donor's* intent. Dozier was the only defendant, however, and the entire trial centered on allegations that he had wrongfully solicited funds. Read in the trial context, therefore, the disjunctive wording "made or solicited" adequately informed the jury that the question before them was whether Dozier had solicited contributions with the intent to base his own conduct on the payment or refusal to pay. Moreover, the court already had given the jury a much clearer explanation of intent under the statute. After discussing specific intent at length, the court instructed the jury as follows:

Now, the bribery statute includes both the giving or offering to give and the acceptance or offering to accept a bribe. The statute would be violated in a situa-

tion where a public officer or any person who has been elected to public office, whether or not such person has assumed the duties of that office, accepts or offers to accept any thing of apparent or prospective value with *specific intent to influence his conduct in relation to his position, employment, or duty* (emphasis added).

We find that these instructions, like the others challenged by Dozier, fairly presented the issues to the jury.

### III. Did the Court Erroneously Permit Prosecution Witnesses to Give Conclusory Opinions?

Dozier submits that the trial court erred in permitting government witnesses to give their reasons for having paid, or refrained from paying, the solicited funds. He also alleges that the trial court improperly admitted conclusory lay opinions on his guilt. These complaints are virtually identical, since the witnesses gave as reasons for their refusal or reluctance to pay Dozier a belief that the payments were sought through duress, or represented a bribe, or were "morally wrong."

██ This court previously has noted that "[t]he victim's fearful state of mind is a crucial element in proving extortion." *United States v. Hyde*, 448 F.2d 815, 845 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972). *See also United States v. Adcock*, 558 F.2d 397, 403–04 (8th Cir. 1977), *cert. denied*, 434 U.S. 921, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977). State-of-mind evidence is admissible in a trial for extortion under color of official right even though proof of direct coercion is not required. *United States v. Craig*, 573 F.2d 513, 520 (7th Cir. 1978), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 111 (1978). Accordingly, the District Court committed no error in admitting the first-hand testimony of these witnesses regarding their contemporaneous impressions of Dozier's financial demands.

The trial judge cautioned the prosecution early in the trial that it must confine such questioning to "whether or not the feelings

that [a witness] had are the feelings or the reasons that he had at that time, and not on reflection at a later date, not now why he did something." After one witness describ- ed having felt that Dozier's "assessments" in return for official services were "morally wrong," the court reminded the jury, at the defendant's request, that moral wrong was not among the issues before them. More important, the court explicitly admonished the jury that a witness's opinion on the legal significance of Dozier's conduct was not to guide their application of the law as delivered by the court:

> The fact that the witness feels some- thing, or doesn't feel something is or not a crime is only his opinion. You will be instructed on the law at the close of all the evidence. The facts that you hear at this trial will be used in connection with the law that I give you, not what any- body else says, that is controlling in this case. And based on the law that I give you and your evaluation of the facts, then it becomes your determination as to what was or was not a crime, if any, in this particular case.

▮▮▮▮ The above instructions ade- quately informed the jury that it was to consider the witnesses' characterization of Dozier's conduct as "extortion" or "black- mail" or "a shakedown" only as evidence of that witness' perception of events as they occurred, not as a conclusive legal opinion. If the defense, having lost the argument on general admissibility, desired a more precise limiting instruction on the extent to which the jury could consider such testimony, it could, and should, have requested one. *See* Fed.R.Evid. 103(a)(1), 105. As given, the court's cautionary remarks were sufficient to cure any prejudice that these otherwise admissible statements might have intro- duced.[7]

---

**7.** Certainly these otherwise admissible expres- sions of a witness's state of mind on hearing Dozier's demands did not become inadmissible merely because they embraced an ultimate is- sue in the trial. *See* Fed.R.Evid. 704.

**8.** *See, e.g., United States v. Brown,* 555 F.2d 407, 416 (5th Cir. 1977), *cert. denied,* 435 U.S.

**IV. Did the Government Fail to Prove that Dozier Conducted the Affairs of his Enterprise "Through a Pattern of Racketeering Activities"?**

The jury convicted Dozier under Count One of the indictment for having conducted the affairs of the Louisiana Department of Agriculture through a pattern of racketeer- ing activities, in violation of the RICO stat- ute, 18 U.S.C. § 1962(c). RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or partici- pate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of un- lawful debt." Prior to trial, Dozier claimed that the Louisiana Department of Agricul- ture was not an "enterprise" within the meaning of the statute. Since precedent in this circuit has compelled him virtually to abandon this approach,[8] he now fastens on the word "through" to support his argu- ment that the government failed to prove his guilt under the terms of RICO.

▮▮▮ The statutory language "through a pattern of racketeering activities" requires the government to prove, according to Dozi- er, that his alleged activities "advanced" or "furthered" the interests of his enterprise, the Department. His argument relies pri- marily on a recent Fourth Circuit decision, *United States v. Webster,* 639 F.2d 174 (4th Cir. 1981), *cert. denied,* — U.S. ——, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), in which that court held "that the prosecution was required to prove that the 'enterprise' . . . had its affairs advanced or benefited in some fashion, direct or indirect, by the pat- tern of racketeering activity." *Id.* at 185– 86. In our recent decision considering pre- cisely this issue, *United States v. Welch,* 656

904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (hold- ing municipal police department to be an "en- terprise" within meaning of Hobbs Act). *See also United States v. Welch,* 656 F.2d 1039 (5th Cir. 1981); *United States v. Bright,* 630 F.2d 804, 809 (5th Cir. 1980) (sheriffs' offices held to be "enterprises").

F.2d 1039 (5th Cir. 1981), however, we found "the reasoning of the Fourth Circuit, and its interpretation of the word 'through,' to be unduly restrictive." *Id.* at 1060–61. In our view, the government must prove that the predicate offenses and the affairs of the enterprise are related.

We do not believe that Congress intended virtually to insulate governmental entities, or other legitimate enterprises, which are being operated by means of racketeering activities, from prosecution under section 1962(c) by requiring that the enterprise be benefited by the racketeering activity. Instead, we conclude that by the use of the word "through," Congress intended only to require a sufficient nexus between the racketeering activities and the affairs of the enterprise.

*Id.* at 1061–62.

*Welch* is fatal to Dozier's position, both in its interpretation of the statutory language and in its factual similarity to this case. One of the RICO convictions upheld in *Welch* was that of a county sheriff who had taken money from gamblers in return for overlooking their local operations and from prisoners in return for his use of official discretion to confer special privileges. In finding the necessary link between the "enterprise"—the Sheriff's Office—and the pattern of illegal activity, we noted that it was the power and authority of his office which enabled the sheriff and his confederates "to enter agreements to refuse to enforce the law or to receive payments for the refusal to enforce the law." The offenses were a part of a scheme to use the Sheriff's Office for illicit profit-making activities.[9] *Id.* at 1062.

Similarly, the offenses that the jury found Dozier to have committed represent a cynical attempt to turn an elective office into a lucrative venture through the sale of official consideration. That Dozier may have planned to spend all or a part of his illegally acquired funds on another campaign for office, thereby plowing the "returns" from his deals back into the ongoing "business" of government, only underlines the vital connection between his office and his offense. Only Dozier's position in the Department of Agriculture and his control over its affairs enabled him to hawk its services for personal gain. The nexus is clear.

## V. Was Dozier Entitled to a Change of Venue?

Dozier next contends that prejudicial pretrial publicity, coupled with misconduct by the U.S. Attorney in charge of the prosecution, entitled him to a change of venue. Principally, he protests what he characterizes as the flagrant misconduct of U.S. Attorney Donald Beckner in attracting press coverage to the grand jury investigation. Included in the record are numerous newspaper reports of Beckner's statements concerning the progress of his investigation. Most are confined to information on the number of witnesses to be called on a given day or the expected date of completion, and most contain refusals to name witnesses who were to testify. As Dozier points out, however, a few report Beckner as having named prospective witnesses, a practice specifically forbidden by Federal Rule of Criminal Procedure 6(e) as interpreted by this Court in *In Re Grand Jury Investigation [T. Bertram Lance]*, 610 F.2d 202, 216–17 (5th Cir. 1980). Dozier insists, therefore, that

---

**9.** At oral argument, counsel for Dozier attempted to distinguish *Welch* by pointing out that the sheriff in that case, once paid, actually used the power of his office to grant favors or carry out threats. Dozier, by contrast, never carried out the promises for which he was paid or retaliated against those who rejected his demands. As we indicated in *Welch*, however, the nexus between office and offense is complete when the power of office enables one to obtain, or at least attempt to obtain, funds illegally. "Without the power and authority of the Sheriff's Office, the defendants in this case (who were all either members of the Sheriff's Office or were associated with the Sheriff's Office in some way) would have been unable to refuse to enforce the law or to receive payments for their refusal to enforce the law." 656 F.2d at 1062. It is irrelevant to this nexus that Dozier was, in some instances, less than successful in exacting an agreement or, in other instances, less than faithful in carrying out those agreements reached.

the prosecution's alleged failure to honor our strict policy of preserving the secrecy of grand jury proceedings warrants our granting a new trial, regardless of whether the misconduct resulted in any demonstrable prejudice on the jury panel. The government responds that any abuses which occurred were technical and contained no factual information that could have swayed a potential juror either way.

 We do not condone breaches of grand jury secrecy, however "technical." Nevertheless, we cannot accept reversal of an otherwise valid conviction as a remedy for every instance of prosecutorial grandstanding during a grand jury investigation. Certainly we cannot order new trials solely because of newspaper accounts of pretrial statements that have produced no proven or even arguable prejudice to a defendant. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips,* —— U.S. ——, ——, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). The less drastic remedy of a contempt citation must serve, therefore, to deter prosecutorial indiscretion at the grand jury level, at least in the absence of prejudice.[10]

As for the publicity allegedly traceable to governmental misconduct in this case, a well-established standard governs our determination of whether the effects of pretrial media coverage require a change of venue. In *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir. 1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980), we reiterated our duty to evaluate claims founded on prejudicial pretrial publicity in accordance with the due process standards announced in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The Supreme Court there held that the

constitutional guarantee of a fair trial does not entitle a defendant to a jury wholly ignorant of the facts surrounding his case.

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 722–23, 81 S.Ct. at 1642–1643. *See also Bronstein v. Wainwright,* 646 F.2d 1048, 1051–52 (5th Cir. 1981).

 The defendants seeking reversal on grounds of prejudicial pretrial publicity, therefore, normally assumes the burden of proving the existence of actual jury prejudice. *Id.* 366 U.S. at 723, 81 S.Ct. at 1642–1643. *Calley v. Callaway,* 519 F.2d 184, 204 (5th Cir. 1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). In several instances the Supreme Court has adopted a more stringent standard on finding that the sensationalism surrounding a trial necessitated a presumption of jury prejudice. *See, e.g., Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966); *Estes v. Texas,* 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1632–1633, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana,* 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963). As we pointed out in *Capo,* 595 F.2d at 1090, however, these were trials "where-

---

**10.** Dozier submits that a defendant is "understandably reluctant" to institute contempt proceedings against the government attorney who must decide whether or not to prosecute him. We note, however, that this is precisely the remedy sought by the defendant in *Lance, supra,* 610 F.2d at 209–10. Lance, in fact, persistently requested sanctions against the prosecu-

tion, including contempt citations and instructions to the grand jury, throughout the grand jury investigation of his activities. Dozier, by contrast, apparently never sought such appropriate relief from the district court until after the indictment had issued and the damage, if any, was complete.

in the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom, transforming the trial into an event akin to a three-ring circus." There is absolutely no showing, nor even any allegation, that the trial of this case devolved into the type of Punch-and-Judy show depicted in those decisions. Indeed, Dozier complains only of *pretrial* publicity, which creates a smaller danger of prejudice than does sensationalism occurring throughout a proceeding. *See United States v. Williams*, 568 F.2d 464, 468 (5th Cir. 1978). Thus, we return to the traditional "actual prejudice" test, under which Dozier must show that community prejudice actually invaded the jury box. *United States v. Williams*, 523 F.2d 1203, 1208 (5th Cir. 1975).

The District Court conducted a voir dire of the prospective jurors before refusing the motion for a change of venue. Dozier maintains that the court was insufficiently zealous in sifting out prejudice flowing from news accounts and complains that three-fourths of those questioned, including twenty-one of the twenty-eight empaneled prior to peremptory strikes, had read or heard of allegations against him. As our quotation from *Irvin v. Dowd* suggests, however, detection of actual prejudice is not accomplished through juggling statistics, nor is a prospective juror's mere awareness of the allegations or facts to be presented conclusive of his or her unfitness. Our focus must rest upon a juror's willingness and ability to put aside any preconceived notions of guilt or innocence and return a verdict based strictly on admissible evidence. Having completed an independent evaluation of the voir dire in this case, and particularly of the portions to which appellant refers us, we conclude that the trial court did not err in rejecting the petition for a change of venue.

The trial judge conducted an extensive voir dire examination of each prospective juror. He specifically asked each person whether he or she had any personal knowledge of the case, what he or she knew, and whether this knowledge could impair that person's ability to serve as a fair and impartial juror. Although many recalled having heard or read something about the case, most could recall few details and all—except the three who were struck for cause—indicated that they held no fixed opinion in the case and would render a verdict based solely upon the evidence presented in court. From the nearly ninety persons questioned in this fashion, Dozier points to eight he claims as especially egregious examples of "potential jurors who indicated extensive exposure to publicity." The court excused two of these for cause. A third, Mr. Rager, is the subject of a separate point of error discussed below. The remaining five, without exception, stated that pretrial media reports would not influence their ability to weigh the evidence placed before them.

Mr. Timothy Tandy, for example, remembered having seen television and newspaper coverage of charges made against Dozier during his unsuccessful bid for reelection. He showed only a vague recollection of their substance, however, and his responses to the court's probing demonstrated his ability to remain impartial. Asked whether he could render a fair verdict despite his living near the parents and sisters of Bob Odom, Dozier's political rival and successor as Commissioner, Tandy replied:

A. I could return either verdict based on what was presented in court and strictly by that. My knowledge of the case, other than just the name of the charges, and descriptions of the acts vaguely, that's all that I have.

Q. Do you have any opinion of any kind now about Mr. Dozier's guilt or innocence?

A. No opinion.

Q. Any feeling of any kind or conclusions?

A. Just I have—I don't have enough knowledge about it to have any problem or conclusion.

The defense never challenged Tandy for cause, and he eventually served on the jury.

As the government points out, the only instance in which the trial court rejected a challenge for cause by Dozier was that involving Mr. Rager, discussed in Part VI. The answers of the remaining veniremen convinced the trial court, and have convinced us, that these prospective jurors were both willing and able to put publicity and preconceived opinions behind them once they entered the jury box. We are satisfied, therefore, that the District Court's patient and comprehensive questioning resulted in the requisite "fair and disinterested panel of jurors." *Capo*, 595 F.2d at 1092.

## VI. Did the Court Commit Manifest Error in Refusing to Excuse Edward Rager?

Finally, Dozier takes particular exception to the trial court's refusal to excuse for cause panel member Edward Rager. He insists that this error forced him to waste on Rager one of the two preemptory strikes that were available to him in the selection of the four alternate jurors. This, in turn, resulted in the seating of an alternate who otherwise would have been struck by the defense and who eventually sat on the convicting jury.

As Dozier notes, our general rule is that "it is error for a court to force a party to exhaust his preemptory challenges on persons who should be excused for cause, for this has the effect of abridging the right to exercise preemptory challenges." *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976). We also observed in *Nell*, however, that "[w]e have no psychic calibers with which to measure the purity of the prospective juror; rather, our mundane experience must guide us to the impartial jury promised by the Sixth Amendment." *Id.* at 1230. Bearing in mind the difficulties of so imprecise a process, we will set aside a trial court's finding of impartiality only when the error is manifest. *Irvin v. Dowd, supra*, 366 U.S. at 723–24, 81 S.Ct. at 1642–1643.

Under careful questioning by the trial court, Rager admitted having heard in the news about the charges against Dozier, although he recalled nothing specific. He also confessed to a threshold impression: "I suppose because the grand jury found reason for a case, I would think that it would make it look more he's guilty than innocent, but I wouldn't make—I could be convinced otherwise, I guess." After further instruction and questioning, however, Rager showed an understanding that he was not to consider the indictment as evidence and that Dozier was presumed innocent until proven guilty. To later inquiries on whether the indictment or pretrial news stories would impair his ability to decide the case solely on the evidence presented at trial, Rager responded "I don't think so."

Once the court had finished its questioning, counsel for Dozier expressed concern about Rager's reluctance to give unqualified answers. The court agreed to call Rager back, and the second period of questioning included the following exchange:

Q. [I]f you were chosen to serve as a juror in this case, could you perform that duty and obligation and accord each side a fair, impartial, unbiased trial and render a fair, impartial, unbiased verdict, based solely on the evidence presented at the trial of this case?

A. I believe so.

Q. Okay, believe it, now, I don't want you to say you believe so. Can you be sure, yes or no, that you could do that?

A. I guess I could be absolutely sure.

Q. What reservation would you have, or what problem would you have in deciding the case based solely on the evidence presented at the trial?

A. Well, again, I would think I would be able to do that. If anything hindered it, it would be unconsciously something I heard before. I wouldn't think it would effect me, but I just can't be sure. You know—

Q. Let me ask you this way. Would you intentionally consider anything that you've heard prior to the trial of this case in reaching your verdict?

A. No.

Q. Could you base your decision based, as far as humanly possible, could you base your decision, and would you base your decision based solely on the evidence and law presented at the trial of this case?

A. Yes.

Q. Do you have any opinion at all now as to the guilt or innocence of the defendant?

A. Well, just what I said before, when I first heard the charges I thought it was maybe because of the campaign. But when they came up again, I thought maybe there was something to them.

Q. Do you understand that the burden rests with the United States to prove Mr. Dozier is guilty beyond a reasonable doubt? Do you understand that?

A. Yes, sir.

Q. You understand that Mr. Dozier does not have to present any evidence. He has a right to remain silent throughout the trial, and he does not have to present any evidence, testimony, or any other type of evidence in the case to prove that he is innocent. Do you understand that?

A. Yes.

Q. The burden always remains with the government. Would you require that Mr. Dozier prove himself innocent or would you—let me ask you that question first. Would you require that Mr. Dozier prove himself innocent based on your feelings about this case?

A. No.

Q. Would you be able to accord to Mr. Dozier his constitutional right that he has, the right to be presumed innocent until proven guilty, the right to remain silent throughout the trial with no presumptions at all arising from those constitutional rights?

A. Yes.

Q. Could you—again I ask you this question. I hate to belabor it, but I want to be—I don't want to keep calling you back in here. Could you, to the best of your ability, decide this case based solely and only on the evidence presented at the trial of this case, and not based on any newspaper, radio, or any other accounts that you may have heard prior to coming to the court?

A. Yes, sir.

Q. Are you certain that you can do that?

A. Well—

Q. Insofar as humanly possible?

A. Yes, sir.

The trial judge then refused to excuse Mr. Rager for cause, giving this explanation of his ruling:

Well, I'm satisfied from hearing his testimony, both initially and afterward, that he could render a fair verdict in this case; he could afford Mr. Dozier all of his constitutional rights, both the presumption of innocence and also to not require Mr. Dozier to present any evidence at all. I think the man is just trying to be honest, and couldn't say what subconsciously would happen, but he wouldn't intentionally at all consider any evidence outside the record of this case, but would base his decision based solely on the evidence presented and the law presented at the trial.

■ We find this an acceptable construction of Rager's responses to the voir dire and are unable to conclude that the court's refusal to excuse Rager amounts to an abuse of discretion. *See United States v. Apodaca*, 666 F.2d 89 (5th Cir. 1982). Rager was temperamentally disinclined to yield categorical answers, as the response "I guess I could be absolutely sure" amply demonstrates. Still, his remarks on his ability to shut out prior impressions do not suggest prejudice or a fixed opinion so much as an unusually candid skepticism toward human capacity for emptying the subconscious at a moment's notice. Moreover, his admission to a pretrial impression that a grand jury indictment "make[s] it look like he's more guilty than innocent" is hardly an

unalterable, or even unusual, notion. Probably many laymen hold such an exalted view of indictments until cautioned otherwise.

American judicial opinion on this subject very nearly begins with Chief Justice Marshall's dictim that "light impressions which may fairly be supposed to yield to the testimony that may be offered; which may leave the mind open to a fair consideration of that testimony, constitute no sufficient objection to a juror." 1 Burr's Trial 416 (1807) (quoted in *Irvin v. Dowd*, 366 U.S. at 722 n.3, 81 S.Ct. at 1642 n.3). Under the court's questioning and instruction, Rager agreed to put aside prior impressions, to accord the presumption of innocence and the right to silence, and to consider only the evidence presented at trial "insofar as humanly possible." We can ask no more of those who must assume, for the duration of a trial, the almost superhuman posture of complete impartiality.

## CONCLUSION

In sum, we conclude that Gilbert Dozier received a fair trial before a properly selected and correctly instructed jury. The judgment below must be affirmed in all respects.

AFFIRMED.