**UNITED STATES of America, Plaintiff,**

**v.**

**Michael H. O'KEEFE, Defendant.**

**Crim. No. 82–110.**

United States District Court, E.D. Louisiana.

March 17, 1983.

John Volz, U.S. Atty., Robert J. Boitmann, Fredericka L. Homberg, Asst. U.S. Attys., New Orleans, La., for plaintiff.

Camille F. Gravel, Jr., William H. Jeffress, Jr., Helen G. Roberts, Alexandria, La., for defendant.

CASSIBRY, District Judge:

On February 5, 1983, the jury in this case returned verdicts of guilty on one count of mail fraud and two counts of obstruction of justice against the defendant, Michael H. O'Keefe. On March 11, 1983, after hearing the arguments of both sides on March 9, this court denied the defendant's motion for judgment of acquittal and two motions for new trial. The court now issues its reasons for denial of those motions.

## REASONS

### 1. *Motion for Judgment of Acquittal*

■ The standard for determining whether a judgment of acquittal should be granted is "whether, viewing the evidence in the light most favorable to the government, the jury could reasonably conclude that the evidence is inconsistent with every reasonable hypothesis of innocence." *United States v. Caucci,* 635 F.2d 441, 445 (5th Cir.1981) (citations omitted). Put another way, a trial judge must grant a motion of acquittal "when the evidence, viewed in the light most favorable to the Government, is such that a reasonably minded jury *must* have a reasonable doubt as to the existence of any of the essential elements of the crime charged." *United States v. Smith,* 631 F.2d 391, 395 (5th Cir.1980), quoting *United States v. Lonsdale,* 577 F.2d 923, 925 (5th Cir.1978) (emphasis in the original). In applying this standard, the court must make all reasonable inferences and credibil-

ity choices in favor of the trier of fact. *United States v. Smith,* supra.

■ In 1981, the defendant was a general partner of the Bridgeman-O'Keefe-Miranne Metairie Towers Partnership, twenty per cent of which was owned by limited partners. The principal asset of the partnership was the Metairie Towers Apartment Building; this building was sold in the fall of 1981 to an entity owned by Darryl Berger and David Burrus. In the negotiations for that sale, the defendant was the chief negotiator for the partnership and his dealings were primarily, if not exclusively, with Darryl Berger. On September 14, 1981, the date of closing, Berger gave to the defendant a check for $900,000 with the words "Demand Loan" written on the check.

The linchpin of this case was the "proper" characterization of the $900,000.

The government alleged (and it was their burden to prove) that O'Keefe defrauded his limited partners by arranging to receive, as part of the purchase price of Metairie Towers, the $900,000 for his benefit and use over and above that received by the partnership. The defendant responded that he believed the $900,000 was a loan, wholly independent of the purchase price of Metairie Towers. The defendant's intent was the central issue: did the defendant intend the $900,000 to be part of the purchase price or did he believe in good faith that the $900,000 was a loan?

Of course, intent may be inferred from the facts and circumstances surrounding a transaction and "the resolution of intent is a question for the trier of fact and should not be lightly overturned." *United States v. Zweig,* 562 F.2d 962, 963 (5th Cir.1977). The court's instructions clearly put the question of intent before the jury for their determination.

Without going into exhaustive detail, the court finds that the evidence was sufficient for the jury to conclude beyond a reasonable doubt that the defendant intended the $900,000 to be part of the purchase price. In the person of the defendant, the jury was presented with a highly intelligent and

undoubtedly sophisticated businessman. Yet this same businessman told the jury that:

(1) He accepted the $900,000 as a loan to be repaid out of the sale of Park Esplanade Apartments. However, such a sale had *never* been agreed to by Berger. Indeed, Berger testified that, before receiving the $900,000, O'Keefe had never told Berger that he would repay the loan out of Park Esplanade.

(2) He considered the $900,000 to be a loan, even though the $900,000 check was unaccompanied by terms, interest rate, a loan note, or collateral—unaccompanied by anything except the words "Demand Loan," which the jury could reasonably have concluded had been written on the check at the defendant's request.

(3) He had received a previous loan from Berger and Burrus for $100,000, which was surrounded with extensive documentation. In an effort to dismiss this documentation, the defendant argued that the $100,000 loan was not a "normal" loan in that its purpose was not to earn interest—yet allegedly that was not the purpose of the $900,000 "loan" either, at least not if the $900,000 was to have been reworked into the sale of the Park Esplanade apartments.

(4) He received the $900,000 from Berger at the closing for the sale of Metairie Towers.

To be sure, O'Keefe had explanations for all of the above. However, the standard of review for this motion requires the court to make all credibility choices in favor of the trier of fact. Here, I do not find it difficult to conclude that the jury simply did not believe that a man such as the defendant had received a "loan" to be repaid out of a sale that *did not exist;* a "loan" that contained none of the traditional indicia of a loan; a "loan" that was made in the middle of a flurry of activity surrounding one and only one transaction—the sale of Metairie Towers. Both Berger and Burrus testified that the $900,000 was given to O'Keefe as part of the purchase price of the building; the jury did not accept O'Keefe's statements of his belief to the contrary.

The documentary evidence does not lead to a different conclusion. The defendant made much of the absence of a $900,000 entry in any of the documents of sale; however, this fact only confirmed—indeed, was a foundation of—the government's contention that O'Keefe sought to defraud his limited partners. The defense's argument was rather baffling in this respect: it seemed at times that the defense believed that fraud was only possible if one included the amount of one's fraud in documents of public record regarding a sale, otherwise an "under-the-table" payment could not reasonably be connected to a particular sale. The jury's rejection of this counter-intuitive notion was hardly surprising and altogether reasonable.

Thus, there was sufficient evidence for the jury to find that the defendant could not have believed in good faith that the $900,000 was anything but a part of the Metairie Towers' purchase price. With this predicate of the $900,000 as purchase price in mind, I turn now to the particular counts of the indictment.

 With respect to count one, the government charged the defendant with mail fraud. Beyond the recited argument by the defendant that the $900,000 was not part of the purchase price but a loan, his only remaining contention is that the evidence did not show he "caused" the mailing which gave rise to this count. The law is clear, however, that:

> Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he "causes" the mails to be used.

*Pereira v. United States,* 347 U.S. 1, 8–9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954). In the instant situation, the defendant informed Robert Jackson of Combined Equities about the sale of Metairie Towers. Combined Equities had a contractual agreement with the partnership to handle communications with the limited partners, including notification of those partners "of significant develop-

ments concerning or affecting the partnership or their investments therein." The sale of the partnership's main asset was nothing if not a "significant development," Jackson's use of the mails was reasonably foreseeable, and the defendant's conviction on this count followed naturally.

■ In count two, the government charged the defendant with obstruction of justice for trying to convince David Burrus to testify falsely to the grand jury about the nature of the $900,000. Viewed in the light most favorable to the government and as previously discussed, the evidence showed that O'Keefe could not have believed the $900,000 to be a loan. Yet he tried to persuade Burrus to testify before a grand jury—a proceeding of which the defendant was inarguably aware—that the decision to treat the $900,000 as purchase price was only a "credit decision." The court instructed the jury that "it is not a crime to attempt to influence a witness to tell what the defendant believes to be the truth." Faced again with a credibility choice, the jury rejected O'Keefe's assertion that he truly believed the $900,000 was a loan and that he was merely urging his version on Burrus; instead, he urged Burrus to lie. The court will not disturb the jury's decision.

■ Finally, in count three, the government charged O'Keefe with obstruction of justice through the presentation of a $900,000 note to the federal grand jury. On March 10, 1982, the defendant was served with a subpoena calling for the production of the following records of the Willows, Inc., and the Willows Apartment, Inc., from September 1, 1981, until the date of the subpoena:

all loan documentation and copies of notes including loans from or to Darryl Berger and David Burrus and entities associated with them.

\* \* \* \* \* \*

all documentation pertaining to loans made from Darryl Berger, David Burrus or any entity with which they are affiliated ... to Michael H. O'Keefe, Ben Daly Bridgeman and any entity they are associated with ...

In response to the subpoena, the defendant produced a folder which contained a copy of a $900,000 note dated the same as the $900,000 check and a copy of the $100,000 check pertaining to the earlier $100,000 loan. There was nothing else in the folder and it was unlabeled.

At the grand jury proceeding on March 19, the following exchange occurred:

Q: Next, we have a folder, and it is undated, and it pertains to—what does it pertain to? You have to speak up. What you say has to be recorded. Do you want to ask your attorney? I need to know what part of the subpoena this refers to.

Mr. Boitmann: We don't want you to explain. We just want to know what it pertains to.

A: Berger.

Q: Put down that it is a loan from Berger so I know what it pertains to, that's all.

To convict the defendant on this count, the jury had to find that O'Keefe presented the note in an effort "to influence, obstruct, or impede the due administration of justice and to mislead the grand jury." Once again, the court has already found that the jury reasonably concluded the $900,000 was no loan. There was no transaction to which the note might refer other than the receipt of $900,000 from Berger and Burrus and no purpose for its creation other than to support the fraudulent contention that the $900,000 was a loan. When the note was created (and the date of this creation was unclear), it was designed to mislead; when produced before the grand jury, it constituted an obstruction of justice.

The defendant seeks to overturn the jury's verdict on count three by a feat of semantic legerdemain: "since the subpoena called for 'copies of notes including [and therefore not limited to] loans from or to Darryl Berger and David Burrus', the $900,000 note, even though never negotiated, obviously was responsive to the express terms of the subpoena." (p. 3, Memoran-

dum for Judgment of Acquittal on Count III.) "Notes," however, do not simply appear from gossamer; it would be nonsense to suppose that the defendant created the note in a spirit of altruism to indebt himself in the amount of $900,000 to Berger and Burrus. Hence, the defendant's suggestion of "and therefore not limited to" is meaningless. The note was inextricably tied to the $900,000 transaction; O'Keefe quite plainly created the note in an effort to support that which he knew to be false: namely, that the $900,000 was a loan. With the production of this note, he endeavored to obstruct justice, and the jury so found.

In sum, based upon an analysis of the evidence in the light most favorable to the government, and the deference owed to the decisions of the jury with respect to issues of the credibility of witnesses, the court denies the defendant's motion for judgment of acquittal on each of the three counts.

### 2. Motion for New Trial in the Interest of Justice

In this motion, the defendant seeks to overturn all or any one of the guilty verdicts on the ground that the verdicts were against the weight of the evidence. To grant such a motion, the court would have to find that a "miscarriage of justice" may have occurred at trial. Having carefully considered the testimony at trial and finding no such miscarriage, the court will not disturb the jury's decision.

### 3. Motion for New Trial: Denial of Change of Venue

■ Finally, the defendant moves for a new trial on the ground that the failure of the court to grant a change of venue deprived the defendant of a fair trial. As the court understands the defendant's motion, it intertwines two separate strands of law: the Sixth Amendment requirement that a petit jury must be selected from a representative cross-section of the community and the evolved standards for granting a change of venue on the ground of prejudicial pretrial publicity.

■ As to the first strand, the defendant's motion comes dangerously close to arguing that he was entitled to a jury with a certain degree of education or occupation. The defendant is, of course, entitled to argue as he chooses, but the court has found no authority for this proposition. The law requires only that a system of jury selection must not be one which systematically excludes any eligible class or group in the community. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). In *Taylor*, the Supreme Court emphasized that:

> in holding that petit juries must be drawn from a source fairly representative of the community we impose no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition, ... but the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof.

Id. at 538, 92 S.Ct. at 702 (citations omitted). Here, it is not even alleged that any such systematic exclusion took place.

The second strand of the defendant's motion proves to be as threadbare as the first. Again, the defendant's argument rests on that which is not supported by the law; in this context, that pretrial publicity equals prejudicial publicity. However, in *United States v. Dozier*, 672 F.2d 531 (5th Cir.1982), the Fifth Circuit recently had occasion to map out the relevant law. The court distinguished between two kinds of cases. On the one hand, there have been cases in which "the sensationalism surrounding a trial necessitated a presumption of jury prejudice." Id. at 545. "[T]hese were trials wherein the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom, transforming the trial into an event akin to a three-ring circus." Id. at 545–6. These were, for example, the trials of Sam Sheppard, of Billy

Sol Estes, and of Wilbert Rideau (in which the defendant admitted in a twenty-minute interview televised three times that he had perpetrated bank robbery, kidnapping, and murder). This was not the trial of Michael O'Keefe.

■ Rather, the defendant's trial was the other kind of case, the normal case, in which the defendant "seeking reversal on grounds of prejudicial pretrial publicity . . . assumes the burden of proving the existence of actual jury prejudice." Id. at 545. Under the traditional "actual prejudice" test, the defendant must show that community prejudice actually invaded the jury box. Id. at 546. Moreover, "the Constitution does not entitle a criminal defendant to a trial by a body of jurors ignorant of all facts surrounding a case, but only an impartial jury that will render a verdict based exclusively on the evidence presented in the court." *United States v. Malmay,* 671 F.2d 869, 876 (5th Cir.1982).

Such is the function of a trial judge's voir dire of prospective jurors. "Courts have generally felt that voir dire examination is the appropriate mechanism for screening jurors to avoid bias." Id. In this case, the initial panel of 120 jurors was subjected to extensive questioning over a period of three days. The examination began with broad-based inquiries about the jurors' acquaintances and affiliations, and gradually focused itself to the point that the court brought each remaining juror into the courtroom one-by-one and asked him or her a variety of questions regarding prior knowledge of the defendant, of his previous trial, and of the factual underpinnings of the case. As a result of the lengthy, individualized questioning, no juror was accepted that had any prejudice in particular from pretrial publicity.

The law requires no more. The defendant was tried by a jury fairly selected and without prejudice against the defendant; he has made no showing to the contrary. The motion for new trial must be denied.