**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Michael H. O'KEEFE,**
**Defendant-Appellant.**

No. 83–3174.

United States Court of Appeals,
Fifth Circuit.

Dec. 22, 1983.

Rehearing Denied Feb. 3, 1984.

Camille F. Gravel, Jr., Helen G. Roberts, Alexandria, La., Miller, Cassidy, Larroca & Lewin, Wm. H. Jeffress, Jr., Randall J. Turk, Washington, D.C., for defendant-appellant.

John P. Volz, U.S. Atty., Fredericka L. Homberg, Robert J. Boitmann, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before GEE and GARWOOD, Circuit Judges, and EAST *, District Judge.

GEE, Circuit Judge:

Defendant Michael O'Keefe was convicted by a jury of one count of mail fraud and two counts of obstruction of justice. On appeal, he claims (1) that the jury was impermissibly prejudiced by information concerning an earlier trial and conviction,

* District Judge of the District of Oregon, sitting by designation.

(2) that the district court's denial of a change of venue deprived him of a fair trial, and (3) that the evidence was insufficient to support any of the three counts. Finding no merit in these contentions, we affirm O'Keefe's conviction.

### I.

In 1981, O'Keefe was a general partner in the Bridgeman-O'Keefe-Miranne Metairie Towers Partnership, 20 percent of which was owned by limited partners. The principal asset of this partnership was the Metairie Towers Apartment Building. In the fall of that year, the building was purchased by Apartment Housing Corporation, a company owned by David Burrus and Darryl Berger. In the negotiations for that sale, O'Keefe was the chief negotiator for the partnership.

On the date of the closing, Berger gave to O'Keefe a check for $900,000 made payable to Willows, Inc., a corporation in which O'Keefe had a controlling interest. The words "Demand Loan" were written on the check, and O'Keefe had always referred to the $900,000 as a "loan." Berger and Burrus always considered the $900,000 to be part of the purchase price of the building, however none of the sales or closing documents contained any reference to the $900,000 payment. This $900,000 was not shared with the limited partners, who did not even learn of it until several months after the sale of the building.

In July 1982, a jury convicted defendant of mail fraud and two counts of obstruction of justice. The district court granted defendant's motion for a new trial based upon the prejudicial misconduct of counsel for the government in his rebuttal argument. In February 1983, a second jury again convicted defendant on all three counts.

### II.

Defendant maintains that a new trial should be granted because extraneous information was injected into the jury's deliberations. This claim is based on a news story, broadcast on a local news station two weeks after the jury returned its verdict, which suggested that one or more of the jurors in the case had known that a guilty verdict was returned in the first trial. At an in camera evidentiary hearing, the trial judge questioned each of the 12 jurors about the possibility of outside influence on their deliberations.

That hearing revealed knowledge by some jurors of a publicized remark that O'Keefe had made concerning the jury in his first trial. On the day after his first conviction, O'Keefe remarked to reporters that he did not feel that the jury was representative of his peers because it consisted largely of "housewives who did not have high school educations" and who "would have had a hard time grasping the situation." At the in camera hearing, seven jurors remembered hearing this "housewives" comment repeated by another juror. Four jurors, including the juror who admitted repeating O'Keefe's remark, testified that the juror's comment was made after the deliberations had ended. Two jurors stated that the comment was made during deliberations. One juror believed that O'Keefe's "housewives" comment was mentioned by a witness during the trial.

■ The district judge found as facts that:

(1) One juror, Mrs. Bell, made a comment referring to the "housewives" statement after a verdict had been reached and the jury had returned to the jury room. (2) Mrs. Bell learned of defendant's remark during the course of the trial when she overheard a comment on the streetcar. (3) Over the course of the trial and the deliberations no juror *knew* that defendant had been convicted in his previous trial.

The court then denied O'Keefe's motion for a new trial.[1]

In any trial, there is initially a presumption of jury impartiality. *United States v. Winkle,* 587 F.2d 705, 714 (5th Cir.), *cert. denied,* 444, U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979). Prejudice may be shown by evidence that extrinsic factual matter tainted the jury's deliberations. *Id.* Thus, an adequate demonstration of extrinsic influence upon the jury overcomes the presumption of jury impartiality and shifts the burden to the government to demonstrate that the influence demonstrated was not prejudicial. *United States v. Howard,* 506 F.2d 865, 869 (5th Cir.1975). Publicity which includes information that the defendant was convicted of the same charge at an earlier trial is a type of publicity which inherently poses a substantial risk of prejudice to defendant if members of the jury are exposed to it. *United States v. Attell,* 655 F.2d 703, 705 (5th Cir.1981).

The trial judge specifically found that the "housewives" statement was made after the verdict had been reached. Such a factual determination is not reviewable unless wholly unsupported by the evidence. *United States v. Granza,* 427 F.2d 184, 185 (5th Cir.1970). This finding of fact is clearly supported by the evidence. The majority of jurors who heard the comment believed it was made after the verdict. The testimony of the two jurors who believed that the comment was made during deliberations was confused and unclear. Indeed, the trial judge specifically found that the testimony of the "after-verdict" jurors was more credible than the two "during-deliberations" jurors. Finally, in that all seven jurors testified that the statement was made only once in front of all the jurors, there is no reason to believe that the statement was made more than once.

O'Keefe argues that Mrs. Bell's knowledge of the "housewives" comment warrants reversal because Mrs. Bell could have inferred from the comment that de-

fendant was found guilty in the first trial and moreover because the statement insulted housewives and the former jury. The trial court, 560 F.Supp. 420, specifically found, however, that Mrs. Bell did not infer that O'Keefe was found guilty in the first trial. In addition, while Mrs. Bell testified that she overheard the "housewives" comment while on the streetcar, she never stated that she knew that it was O'Keefe who had made the statement.[2] Finally, the "housewives" comment was simply not sufficiently "insulting" to constitute prejudice. *See, e.g., Goins v. McKeen,* 605 F.2d 947, 953 (6th Cir.1979) (the newspaper article at issue contained information "which was both inadmissible and strongly probative of guilt"). An appellate court should accord great weight to the trial court's finding that the evidence in no way interfered with any juror's decision. *United States v. Bagnariol,* 665 F.2d 877, 887–88 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Consequently, the district court correctly refused to grant a new trial.

### III.

O'Keefe next contends that the district court erred in denying his motion for change of venue in that the newspaper, radio and television reports of his first trial saturated the community with prejudicial pretrial publicity.

A defendant is entitled to "a fair trial by an impartial jury which will render its verdict based upon the evidence and arguments presented in court without being influenced by outside, irrelevant sources." *United States v. Chagra,* 669 F.2d 241, 249 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982). Exposure to pretrial publicity does not, however, automatically render a juror unfit to serve. *Id.* In order to obtain a reversal of his

---

102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982). Here, however, defendant and his counsel had no way of knowing that any of the jurors would have heard about the earlier verdict or the "housewives" comment, and thus had no reason to ask that the jury be polled. The right to object was not waived.

2. At the in-camera hearing, Mrs. Bell testified:
   [I was on] the streetcar and I heard some people talking about the trial and the lady said something about that first jury, they said the first jury was housewives.

conviction because of pretrial publicity, a defendant must show that a juror was actually prejudiced by it. *United States v. Capo,* 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied,* 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980).

Prejudice will be presumed when the defendant produces evidence of pervasive community prejudice in the form of highly inflammatory publicity or intensive media coverage. *Id.* at 1090. This presumption is rebuttable, however, and the government may demonstrate from the voir dire that an impartial jury was actually impanelled in an appellant's case. *Chagra,* 669 F.2d at 250. If the government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity. *Id.*

O'Keefe has not demonstrated actual prejudice. Proof of actual prejudice is normally made by reliance upon the jurors' voir dire responses. *Id.* At voir dire, each juror stated that he or she did not know the result of the former proceedings. The jurors also stated that they could not think of anything that might affect their ability to give both sides a fair trial. While some jurors had heard or read something about the case, mere awareness of the allegations or facts to be presented does not constitute prejudice. *United States v. Dozier,* 672 F.2d 531, 546 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982).

O'Keefe has also failed to show pervasive community prejudice to establish a presumption of juror prejudice. The principle of presumptive juror prejudice is only rarely applicable. *Mayola v. Alabama,* 623 F.2d 992, 997 (5th Cir.1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). It has generally been applied only in cases "wherein the press saturated the community with sensationalized accounts of the crime and court proceedings, and was permitted to overrun the courtroom, transforming the trial into an event akin to a three-ring circus." *Capo,* 595 F.2d at 1090–91. The presumption is generally not applied to cases in which the news accounts complained of are "straight news stories

rather than invidious articles which would tend to arouse ill will and vindictiveness." *Calley v. Callaway,* 519 F.2d 184, 206 (5th Cir.1975), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). The news accounts in the instant case are impartial and straightforward. They simply do not constitute the type of sensationalized reporting that would support a claim of presumptive prejudice. In any event, even if the news accounts were considered presumptively prejudicial, the presumption is rebutted by the district court's finding that no juror knew of the conviction during the trial. *Chagra,* 669 F.2d at 250.

O'Keefe also argues that the denial of a change of venue prejudiced his ability to select a jury drawn from a fair cross section of the community, asserting that the trial court's excusals of those persons who knew of the prior verdict eliminated from the venire those persons who read newspapers or paid attention to local community events. O'Keefe fails, however, to show that any specific class has been excluded. First, a person's lack of knowledge of a specific occurrence does not show that the person does not pay attention to current events in general. *United States v. Duncan,* 598 F.2d 839, 866 (4th Cir.1979), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1980). Second, while O'Keefe is a state senator who represents a particular senatorial district located within Orleans Parish, the jurors were drawn from the Eastern District of Louisiana, an area comprising 13 parishes. O'Keefe cannot assume that all informed citizens of these parishes will keep abreast of every scandal in every parish. *United States v. Smith,* 550 F.2d 277, 280 (5th Cir.), *cert. denied,* 434 U.S. 841, 98 S.Ct. 138, 54 L.Ed.2d 105 (1977). *See also United States v. Smaldone,* 485 F.2d 1333 (10th Cir.1973), *cert. denied,* 416 U.S. 936, 94 S.Ct. 1934, 40 L.Ed.2d 286 (1974). There is no disproportionate exclusion from the venire of an identifiable group.

## IV.

Next, O'Keefe maintains that the evidence is insufficient to sustain a ver-

dict of guilty on any of the counts. The standard for appellate review of criminal convictions for sufficiency of the evidence is whether a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982), aff'd, —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983). In evaluating the conviction, we must consider the evidence in the light most favorable to the jury verdict, resolving all reasonable inferences and credibility choices in favor of it. *United States v. Montemayor,* 703 F.2d 109, 115 (5th Cir. 1983).

The government alleges in Count 1 of the indictment (mail fraud) that O'Keefe defrauded his limited partners by arranging to receive, as part of the purchase price for the Metairie Towers Apartment Building, the $900,000 for his benefit over and above that received by the partnership. The key issue is whether O'Keefe intended the payment to be part of the purchase price or to constitute a loan.

Intent may properly be inferred from all the facts and circumstances surrounding the transaction. *United States v. Porter,* 441 F.2d 1204, 1210 (8th Cir.), cert. denied, 404 U.S. 911, 92 S.Ct. 238, 30 L.Ed.2d 184 (1971). The determination of intent is a question for the trier of fact and its decision should not lightly be overturned. *United States v. Zweig,* 562 F.2d 962, 963 (5th Cir.1977). The evidence here, viewed in a light favorable to the government, could certainly convince a reasonable jury that O'Keefe intended that the $900,000 be part of the purchase price.

Several facts support this view. First, it was O'Keefe who first suggested that Berger pay $900,000, and that suggestion was made during negotiations for the purchase of Metairie Towers. Berger and Burrus testified that at all times they considered the $900,000 as part of the purchase price of the building. O'Keefe received the $900,000 at the closing of the sale of Metairie Towers. Finally, the $900,000 "loan" was unac-

companied by terms, an interest rate, a promissory note, or collateral, in stark contrast to a previous loan for $100,000 from Berger and Burrus to O'Keefe, which was extensively documented. Making all credibility choices in favor of the trier of fact, we find that the jury verdict was supported by sufficient evidence.

### V.

In Count 2, O'Keefe was charged with obstruction of justice for attempting to convince Burrus to testify falsely to the grand jury regarding the $900,000 transaction. O'Keefe admitted that in March 1982 he told Burrus, after trying to convince him that the $900,000 payment was a loan, that "[i]f you don't explain this thing right, I'm in jail...." [3]

O'Keefe argues that this comment could not constitute obstruction of justice in that he *actually* believed that the $900,000 payment was a loan and was merely attempting to influence Burrus to tell what he believed to be the truth. Yet in finding defendant guilty of mail fraud, the jury implicitly found that defendant *intended* the $900,000 payment to be part of the purchase price. Consequently, by arguing to Burrus that the transaction was a loan, defendant attempted to convince Burrus to testify falsely. The jury properly found an obstruction of justice.

### VI.

In March 1982, O'Keefe was served with a subpoena duces tecum which requested: "All loan documentation and copies of notes including loans from or to Darryl Berger and David Burrus and entities associated with them."

In response to the subpoena, defendant produced a folder which contained a copy of a $900,000 note with the same date as the $900,000 check from Burrus and Berger, and a copy of the $100,000 check pertaining to the earlier $100,000 loan. At the grand jury proceeding, O'Keefe identified the con-

---

**3.** O'Keefe testified that he said something to that effect, although he may not have used those exact words.

tents of the folder as relating to "Berger." Berger and Burrus testified that they never saw the note, and it is undisputed that there had been no discussion of the term and interest rate set forth.

 These facts support a conviction for obstruction of justice. The jury found that O'Keefe *knew* that the $900,000 check was not a loan. Consequently, the presentation to the grand jury of any note which supported the existence of such a loan could only have been meant to mislead the grand jury. As Judge Cassibry stated in his order denying O'Keefe's motion for a new trial:

> it would be nonsense to suppose that the defendant created the note in a spirit of altruism to indebt himself in the amount of $900,000 to Berger and Burrus.... The note was inextricably tied to the $900,000 transaction; O'Keefe quite plainly created the note in an effort to support what he knew to be false: namely, that the $900,000 was a loan. With the production of this note, he endeavored to obstruct justice, and the jury so found.

Thus, a reasonable jury could well have found that the evidence established guilt of obstruction of justice beyond a reasonable doubt.[4]

### VII.

Finally, O'Keefe argues that a statement made by the government during cross-examination requires reversal as to Count 3. During cross-examination as to the events underlying Count 3, O'Keefe repeatedly testified that the grand jury could not possibly have been misled. Counsel for the government responded by stating "[d]idn't the grand jury charge you with misleading them by producing the note?" Counsel for O'Keefe objected and a discussion was had at the bench. O'Keefe did not ask for a curative instruction or a mistrial. He now contends, however, that by this remark counsel for the government asked the petit jury to regard the grand jurors as

witnesses against O'Keefe because they indicted him.

First, it is not at all clear that the statement gave such an impression to the jury. In any event, any error caused by this remark was surely harmless, for the jury was instructed during voir dire, during the preliminary instructions, and during final instructions, that the indictment was no evidence of guilt.

Thus, finding O'Keefe's contentions on appeal to be without merit, we affirm his convictions on all three counts.

AFFIRMED.

---

4. Defendant argues that the allegations in Count 3 of the indictment fail to state an offense under 18 U.S.C. § 1503 (Supp. V 1981) (obstruction of justice). The indictment specifically states that defendant "did present to the Grand Jury a $900,000 note ... which note ... O'KEEFE well knew was not true evidence of any loan made from Darryl Berger and David Burrus...." This plainly charges an offense of obstruction of justice.