# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 97-DR-01609-SCT

*ANTHONY CARR*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 9/19/1990 |
| TRIAL JUDGE: | HON. ELZY JONATHAN SMITH, JR. |
| COURT FROM WHICH APPEALED: | QUITMAN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: TERRI L. MARROQUIN |
| | WILLIAM CLAYTON |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | LAURENCE Y. MELLEN |
| NATURE OF THE CASE: | CIVIL - DEATH PENALTY - POST CONVICTION |
| DISPOSITION: | APPLICATION FOR LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART - 05/20/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.    Before the Court is Anthony Carr's Application For Leave To File Petition For Post-Conviction Relief And Memorandum In Support Thereof filed by the Mississippi Office of Capital Post-Conviction Counsel.  On September 19, 1990, Carr was convicted and sentenced to death on four counts of capital murder.  Carr asserts that he is entitled to relief based primarily on claims of prosecutorial misconduct and

ineffective assistance of counsel, but he also asserts that he should be resentenced pursuant to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). Finding his arguments as to prosecutorial misconduct and ineffective counsel to be without merit, we deny the petition to that extent. However, as to the *Atkins* issue, we grant Carr leave to proceed in the trial court on the question of his mental status.

**FACTS**

¶2. This Court's opinion in *Carr v. State*, 655 So.2d 824 (Miss. 1995) (*Carr I*), *cert. denied*, 516 U.S. 1076, 116 S.Ct. 782, 133 L.Ed.2d 733 (1996), included the following factual recitation:

> On Friday, February 2, 1990, Carl Parker, his wife Bobbie Jo, and their children, twelve year old Gregory and nine year old Charlotte, left the Riverside Baptist Church in Clarksdale to return to their home on Highway 322 in rural Quitman County, some fifteen miles from Clarksdale. The Parkers were last seen leaving the church between 8:45 and 9:15 p.m. that evening.
>
> Around 11:00 p.m., Billy King was driving east on Highway 322 when he spotted a fire at the Parker home. Mr. King went to the house, tried to open the unlocked carport door, but was driven back by the fire. Mr. King left the Parkers' house and drove to the house of the nearest neighbor to call for help. Mr. King did not pass any vehicles on his way to the neighbor's house, but as he looked back towards the Parkers' house from the neighbors' front door, he saw two vehicles leave the Parker house, driving west on Highway 322.
>
> At approximately the same time that King was at the neighbor's house trying to get help, Joe McCullough was driving east on Highway 322. McCullough testified that he remembered meeting two vehicles that were tailgating closely and traveling very fast towards Clarksdale. He identified the lead vehicle as a Silverado pick-up truck.
>
> Fireman Jerry Wages with the Lambert Volunteer Fire Department received the call reporting the Parkers' fire between 11:00 and 11:20 p.m. It was raining heavily that evening. Wages was the first to arrive at the scene of the fire, and he found the southwest corner of the house on fire. The back door was unlocked, and he crawled into the house. He recovered the body of Carl Parker. Wages went back into the house and recovered the bodies of Charlotte and Gregory. Wages recalled that Carl and Gregory were bound at their feet and ankles and their wrists were tied behind their backs. There was also a remnant of a binding on Charlotte's wrist. Charlotte was undressed from the waist down

2

beneath the dress she was wearing. Wages said she had a wound on her hip as well. The body of Bobbie Jo Parker was not discovered until the early morning hours after the fire was finally extinguished. Her body was found in the southwest corner of the house and was burned beyond recognition.

Quitman County Sheriff Jack Harrison arrived at the scene and notified authorities that Carl Parker's red Silverado pick-up truck was missing. He saw the bodies and noticed the hands and feet of Carl and Gregory were bound. Charlotte had a red ribbon tied around her arm. Her knee high stockings were partially burned off, and she did not have on underclothes. Bobbie Jo Parker's body was found lying on some springs around 2:00 or 2:30 a.m.

Around midnight that same night, Eddie Lee Spralls, a Clarksdale resident, looked out his back window after hearing a door slam and observed a red truck backing up between two abandoned houses. Spralls called the police. Upon arrival, the Clarksdale police put a spotlight on the truck. Two black males jumped out of the truck and ran toward Highway 61.

The truck, identified by the police as Carl Parker's, was parked close to the home of Robert Simon's mother-in-law. It was filled with household items, furniture, appliances, and other valuables, all belonging to the Parkers. A shotgun was found in the back of the truck, and a pillow case containing two revolvers and other items belonging to the Parkers was found near the truck.

Martha Simon, Robert Simon's wife, had left Memphis and had driven to Clarksdale to see her mother on February 2, 1990. She said that Carr had been living with her and Robert in their Memphis apartment for the previous three weeks. Around 12:30 a.m. on February 3, 1990, Martha was in her car when she saw Carr walking down the street. Carr asked Martha if she had seen Robert. Martha replied that she thought Carr and Robert had been together, but Carr told her that he had come on ahead and Robert was behind him. She asked Carr how he got to town. Carr responded that he was driving a truck and pointed in the direction where the Parker truck was later found. Carr told her that he had parked the truck on 9th Street and that the truck had "stuff" in it. He also told Martha that he had some money. Carr said that he had put the keys to the truck along the railroad tracks and some coveralls in a dumpster, the location of which Carr told her.

Martha again saw Carr looking for Robert around 8:00 a.m. at her mother's house. The next time she saw Carr, Robert was with him. They came to Martha's mother's house and told her they were going to Memphis. Carr was wearing a black jogging suit each of the three times Martha saw him.

Coahoma County Sheriff Andrew Thompson, Jr., received information from Martha Simon that led to the recovery of a pair of coveralls and a pair of work gloves from

3

a locked dumpster near Simon's mother-in-law's house in Clarksdale. The coveralls were wet and smelled of smoke. The gloves were identified by Dean Parker, Carl Parker's son, as the same type gloves he had given his father.

Ken Dickerson, an investigator with the Highway Patrol, and Sheriff Thompson, with Martha Simon's permission and in her company, went to Memphis to search the apartment she shared with her husband, Robert Simon. They found the wet, black jogging suit Carr was wearing earlier that day. Other items including a man's and a woman's wedding rings, a money clip, and ammunition were also found in the apartment. Martha identified items in the apartment that had not been there earlier.

Scott Parker and Dean Parker, Carl's sons from a previous marriage, identified many of the items found in the truck, the pillow case, and the apartment in Memphis. Carr's fingerprint was found on the shotgun found in the truck.

On February 3, 1990, two arrest warrants were issued in Marks, Mississippi. Anthony Carr and Robert Simon, Jr., were arrested around 3:30 p.m. that day in Clarksdale.

According to Anthony Washington, an inmate at the Tate County jail in the early part of February, 1990, Carr came in around midnight and was put into the cell next to his. Washington asked who he was and what he was in for, and Carr told him. Washington had been reading about the crime in the newspaper and offered to read the story to Carr. Washington said that he and Carr were playing cards when Carr stopped and said "we had a ball," as he held his hand to his head like a gun.
Carr was later taken for a blood test. Upon his return, Carr asked Washington "are you straight?" and whether he could tell Washington something "brother to brother." Carr asked Washington if they could tell if he raped that little girl, and Washington asked him what happened. Carr told Washington that he and his partner had raped the little girl and that one of them had to burn the house down to destroy the evidence.

Dr. Steven Hayne, a pathologist, testified to the cause of deaths of each of the Parkers. Carl and Gregory, both shot twice, died of gunshot wounds. Bobbie Jo, burned beyond recognition and with one bullet retrieved, died of a gunshot wound. Charlotte, shot three times, died of smoke inhalation. Dr. Hayne testified that there was evidence of sexual battery, both vaginally and anally, to Charlotte. Also, the fourth digit of Carl Parker's left hand was missing.

*Carr I*, 655 So.2d at 830-32. A nine-day trial was held in Alcorn County. Carr was convicted on all four counts of capital murder and sentenced to death by lethal injection for each count. He raised thirty issues in which he claimed error was committed by the trial court. After consideration of each assignment of error,

4

this Court affirmed Carr's conviction and sentence to death by lethal injection on each of the four counts. Carr has now filed this motion for post-conviction relief.

## DISCUSSION

¶3.    The purpose of post-conviction proceedings is to bring forward facts to the trial court that were not known at the time of the judgment. *Williams v. State*, 669 So. 2d 44, 52 (Miss. 1996). The procedure is limited to those facts and matters which could not or should not have been brought at trial or on direct appeal. *Id.*; Miss. Code Ann. §§ 99-39-1 to -29 (Rev. 2000 & Supp. 2003). If newly discovered evidence would likely produce a different result or verdict and the proponent shows that the evidence was "discovered since the trial, that it could not have been discovered before the trial by the exercise of due diligence, that it is material to the issue, and that it is not merely cumulative, or impeaching" then such evidence warrants a new trial. *Ormond v. State*, 599 So. 2d 951, 962 (Miss. 1992).

### I.    WHETHER THE PROSECUTION KNOWINGLY PRESENTED FALSE TESTIMONY TO THE JURY.

¶4.    Carr claims the prosecution knowingly elicited false testimony from Anthony Washington. Washington was a prosecution witness, who recounted conversations he had with Carr shortly after Carr's arrest for the Parker murders. Carr, on direct appeal, raised the issue of the unreliability of Washington's testimony. *Carr I*, 655 So. 2d at 836-37. This Court found "no evidence to indicate that Washington was offered any kind of reduced sentence in exchange for his testimony. In the absence of evidence that he stood to gain anything by his testimony" there was no merit to Carr's assignment of error. *Id.* Carr did not claim in his direct appeal that the prosecution had elicited false testimony from Washington.

¶5.    Carr attached to his petition a transcript of Washington's plea hearing which was held on December 13, 1991. The transcript shows that Washington testified he was told by Bill Ellis and Mr. Mellen that they

5

would work with him for being a State witness. Laurence Mellen was the District Attorney, and Bill Ellis was an investigator on the case. During Washington's plea hearing, Mellen stated that "[he] intended to accept Bill Ellis's recommendation and request, and ask the Court to consider a suspended sentence as to Washington."

¶6.     This evidence was not brought before this Court in the direct appeal. Washington testified at the trial that no one had offered him anything and that no promises of any kind were made. Mellen stated that no one made any promises to Washington. Washington did not say that he was promised anything before he testified in Carr's capital murder trial. What he said was:

> The Court: Over in Corinth. Carr, was that the defendant?
> The Defendant: Yes, Sir.
> The Court: Carr made some jailhouse statement of confession to you?
> The Defendant: Yes, sir.
> . . . .
> The Court: Is that the reason the State called you?
> The Defendant: Yes, sir.
> The Defendant: . . . All I know is when I testified for that capital murder case, that the State was going to work with me with the case I got here. How much time I was going to get, I don't know. And, what time I was going to do, I don't know.

¶7.     Carr argues that Washington has now recanted his earlier testimony in Carr's capital murder trial by stating he was told the State would work with him. This Court, in *Williams v. State*, 669 So. 2d 44 (Miss. 1996), faced a similar situation. Evans, a prosecution witness, recanted his testimony after he originally testified against Williams. *Id.* at 53. The District Attorney, two of his assistants and a co-indictee all testified that no deal or promises were ever made. *Id.* at 47. In reviewing Evans's recantation, this Court stated, "[i]n a death penalty case, admission of perjured testimony mandates a new trial, *where there is a reasonable probability that a different result will be reached* in the new trial without the perjured testimony." *Id.* at 53 (emphasis added); *Smith v. State*, 492 So.2d 260, 264 (Miss. 1986).

6

With that in mind, we find no reasonable probability that a different result would be reached in a new trial. Washington never explicitly says he had a deal. He only states that the prosecution said they would work with him. This is not an unusual statement made by prosecutors. Generally plea agreements are written documents; Carr has attached no such document to his petition. *Id.* at 54. This absence is presumptive that no plea agreement existed. Furthermore, in Carr's direct appeal this Court addressed Washington's testimony, criminal record, motivation for testifying, and stated that the "circumstances surrounding his recitation of statements made by Carr were all factors properly left to the jury to weigh. Instruction C-1 properly instructed the jury as to the weight and credibility to be given such testimony" *Carr I*, 655 So.2d at 837. It is the responsibility of the jury to determine the credibility of witnesses, even a witness who is a convicted felon. *Brown v. State*, 798 So.2d 481, 491 (Miss. 2001). We find this issue to be without merit.

## II. WHETHER THE PROSECUTION KNOWINGLY FAILED TO PROVIDE TRIAL COUNSEL WITH EXCULPATORY AND IMPEACHMENT MATERIAL.

¶8.  Carr claims the prosecution withheld *Brady*[1] material in two specific instances and committed other prosecutorial misconduct in two other instances:

### A. Redacted Statements of Co-Defendant

¶9.  Carr asserts that the prosecution withheld portions of statements made by his co-defendant Simon and that the withheld portions were favorable to his defense. Specifically, portions of Simon's second statement had been redacted, blacked out, before being turned over to Carr. In his first statement, dated February 5, 1990, at 10:45 a.m., Simon said he saw Carr around 11:00 p.m. on the night of the murders

---

[1]*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

and that he had two rings to sell, a man's and a woman's. Simon also stated "[i]f I were to guess that someone who might have done it with [Carr], it might have been Willie Henderson." In Simon's second statement dated February 5, 1990, at 11:20 a.m., the entire first paragraph is blacked out. In the second paragraph, only two items are blacked out and Simon's statement implies that someone hired him to kill the Parkers.

> I came to Clarksdale and went to [redacted] on the weekend of January 27 and 28, 1990. [redacted] told me that he needed a job done and drew me a diagram of the Parker house. . . . I asked them why he wanted him killed, and they told me, 'It was none of my business.' He said he would pay me fifteen hundred dollars to do the job . . . Then, this week, Friday, February 2, 1990, I went to the Parker's around 8:30 p.m. . . . I left, rushed to Clarksdale. . . . I went back to Clarksdale, I am not going to say who was with me. . . . I killed [another man] with the guns that I used on the Parkers.

¶10. Carr's post-conviction counsel obtained the unredacted statements of Simon after issuing a subpoena for the records and reports created by the Mississippi Highway Patrol's Criminal Investigation Bureau. A sworn affidavit from trial counsel's investigator dated September 29, 2001, states that during the trial the defense was never made aware of the redacted portions of Simon's statements.[2]

---

[2]In the case sub judice, "Carr asked the trial court to admit the portion of Simon's statements indicating that Simon killed the Parkers and keep out portions of the same statements that indicated Carr killed the Parkers. This request was refused. Prior to trial, Carr filed a motion in limine to exclude all statements made by Simon. Carr argued that admission of any of the Simon statements would violate Carr's right to confront witnesses. The State announced its intention not to introduce any of Simon's statements, and the trial court ruled Simon's statements would not be admissible against Carr." *Carr v. State* 655 So. 2d at 834.

During the guilt phase, "Carr moved to introduce the portion of Simon's statement in which Simon alleged that he had killed "the Parkers." The trial court found that the statement was inadmissible 'at this time'. After the State rested, Carr made an offer of proof that criminal investigator Bill Ellis would testify that Simon said he killed the Parkers with his weapons. The trial court found this statement inadmissible because it lacked corroboration and trustworthiness and because it was not offered to exculpate Carr. The trial judge found the statements were not exculpatory of Carr because Simon first said that Carr and another person killed the Parkers and later said that he killed the Parkers. *Id*.

¶11.    In *Brady v. Maryland*, 373 U. S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L.Ed.2d 15 (1963), the United States Supreme Court established the principle that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In determining whether a *Brady* violation has occurred, and thus a new trial is mandated, this Court applies the four-part *Brady* test adopted in *King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995), under which the defendant must prove:

> a. that the State possessed evidence favorable to the defendant (including impeachment evidence);
> b.  that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence;
> c.  that the prosecution suppressed the favorable evidence; and
> d.  that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*Id.* at 1174.

¶12.    The United States Supreme Court has since held that not all failures to disclose exculpatory evidence constitute reversible error. Rather, the question is whether there is a "reasonable probability" that the verdict would have been different but for governmental evidentiary suppression which "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (citing *United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The government could violate *Brady* if it failed to turn over exculpatory evidence, even if it was never requested, "when suppression of the evidence would be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Kyles*, 514 U.S. at 433, 115 S.Ct. at 1565.

¶13.    The redacted statements concealed information concerning the Parker murders and the possibility that one of the investigating officers was involved in the murders. That investigating officer, Officer Self,

9

was the first officer to interrogate Carr. In a hearing, regarding this issue, Kenneth Dickerson, an investigator with the Clarksdale Police Department, was asked about the redacted portions and erroneously told the court that those portions referred to other crimes, not the Parker murders.

¶14. The first paragraph, which was completely redacted, contained the name of the person Simon said asked him to kill the Parkers. In the second paragraph that person's name was again blacked out. The first paragraph also contained the name of a police officer, Charlie Payton, who Simon claimed worked for the man who hired him to kill the Parkers. Any reference to Payton, Officer Self and any other Clarksdale police officers were redacted throughout the second statement.

¶15. Carr argues that these redacted portions would have been material to both his guilt and his punishment, and this information would have given him a very different theory of defense, as well as the opportunity to impeach possible witnesses. According to the sworn affidavit of J. Phillip Smith, Carr's defense attorney, had they "known of Charlie Paden [sic] and Officer Self's involvement in the case, we would have pursued that to the best of our abilities. We would have made an issue about Officer Self's involvement in the murder had we known of it at the time, especially since he was one of the first people to obtain a statement from Anthony Carr regarding this matter." It stands to reason, however, that given the small number of law enforcement officers in Clarksdale, Carr could have obtained the names of all of them and pursued an investigation of the officers who were involved. With reasonable diligence he could have obtained the information himself, thus his argument fails the second part of the four-part *Brady* test. Further, Carr does not show that there is a reasonable probability that, had the unredacted statements been disclosed to him, the result of the proceeding would have been different, as required by *Kyles v. Whitley*, 514 U.S. at 433. This *Brady* challenge is without merit.

*B. The fingerprint on the shotgun*

10

¶16.    Within hours after the Parker family was murdered, Parker's pick-up truck was found parked close to the home of co-defendant Simon's mother-in-law. It was filled with household items, furniture and other valuables belonging to the Parkers. As the items were removed from Parker's truck, an inventory list was made, item by item. Carr claims that the prosecution failed to turn over this inventory list as part of the discovery process. He claims that the list would place the shotgun, not on the bottom of the truck bed as was testified to in court, but somewhere in the middle of some 40 items removed. Carr argues the incorrect testimony regarding the placement of the shotgun wrongfully puts him at the scene.

¶17.    A review of that inventory list reveals that the shotgun was listed as number 26 out of 42 items, but the items vary in size from a pair of eyeglasses to a dining room table with 4 chairs. Given the very diverse nature of these items, it would be rank speculation to presume that the unloading process was accomplished in exactly the reverse order as the loading process.

¶18.    Further, Carr claims the documents, turned over to post-conviction counsel were received on September 11, 2001, and said documents were not in any of the material given to post-conviction counsel by Carr's trial counsel. Carr asserts the fingerprint was essential to the State's case because, as the District Attorney stated, the gun would not have been at the bottom of the truck if Carr had not been there. Had this evidence been given to defense counsel, Carr argues, it could have been used to rebut the prosecution's assertion that because the gun was found in the bottom of the truck, Carr was there and committed the crimes. Because the fingerprint found on the gun was the only fingerprint of Carr's found on any item removed from the house, the inventory list potentially was exculpatory.

¶19.    Carr offers only a footnote statement that the material was handed over on September 11, 2001. He attaches no affidavits in support of his claim. He also makes no claim that he requested the inventory lists and that they were not turned over. The absence of any supporting proof regarding the unloading

11

process and that this information was not available before trial or on Carr's direct appeal leads to the conclusion that this assignment of error is without merit.

## C. Fruit of the Poisonous Tree

¶20.    Carr brings forward his accusations about the name of Officer Self being redacted from the statement of Simon, and incorporates it into his "poisonous tree" argument. His broad, general, bare-bones allegation that he would have done things differently is not sufficient to meet his burden of proving by a preponderance of the evidence that he is entitled to relief. *Neal v. State*, 687 So. 2d 1180 (Miss. 1996). Carr alleged that Officer Self was implicated in the conspiracy which led to the deaths of four people, and called Self a "rogue cop"  However, there is no proof of what, if anything, Carr would have done differently, or how a different approach to the case would have altered the outcome, had he known Officer Self had been implicated in some way with the murders.

¶21.    Carr also claims that his first statement after his arrest , given to Officer Self, was obtained unconstitutionally; thus every other statement thereafter was tainted by the first and any confessions made during the interrogations were "fruit of the poisonous tree." Officer Self, however, was not the only officer who interviewed Carr. The first statement Carr gave was suppressed before the trial began, along with five other statements. Thus the potential "poison" was removed. Apparently nine statements were taken in all. Although Carr mentions that Self "Mirandized" him, there is no indication that Self was the only officer who gave *Miranda* warnings, or how many times Carr was warned.

¶22.    This assignment of error is without merit.

## D. Improper Demonstrative Evidence

¶23.    Carr claims that it was prosecutorial misconduct for District Attorney Mellen to provide demonstrative evidence. Carr claims that during the trial Mellen acted out the role of each corpse in an

attempt to assist Dr. Hayne in demonstrating the wounds found on the victims. Defense counsel's

objections were overruled. We find this assignment of error to be without merit. Obviously this information

was available to Carr and his counsel before his direct appeal. Post-conviction relief is limited to those

facts and matters which could not or should not have been brought at trial or on direct appeal. See Miss.

Code Ann. § 99-39-21(1). This evidence was available, the objection properly preserved the issue for

appeal and the proper time to bring this information before this Court was on direct appeal. Carr has not

shown that a reasonable probability exists that the outcome of his trial would have been different.

Accordingly this assignment is without merit, as well as procedurally barred.

¶24.    The State addressed all four of the foregoing specific allegations of prosecutorial misconduct

together as a single issue - prosecutorial misconduct. The State then argued that the issue of prosecutorial

misconduct was raised and addressed on direct appeal, and thus Carr's claims fail as res judicata, under

Miss. Code Ann. § 99-39-21(3). However, our review of the specific prosecutorial misconduct discussed

in *Carr I* reveals that the prosecutorial misconduct complained of there did not include any mention of the

four specific items of prosecutorial misconduct stated in Carr's present petition for post-conviction relief

which is now before this Court: namely  (1) the redacted statements; (2)  the location of the shotgun with

Carr's fingerprint on it; (3) the "fruit of the poisonous tree"; and (4) the District Attorney's demonstrative

evidence.

¶25.    The State argues that:

> to the extent that the prosecutorial misconduct argument in this petition is presented on a
> different factual basis from that at trial, Carr is further barred by Miss. Code Ann. § 99-
> 39-21(2).
>> The litigation of a factual issue at trial and on direct appeal of a specific
>> state or federal legal theory or theories shall constitute a waiver of all other
>> state or federal legal theories which could have been raised under said
>> factual issue; and any relief sought under this article upon said facts but

> upon different state or federal legal theories shall be procedurally barred
> absent a showing of cause and actual prejudice.

Carr cannot now attempt to relitigate this claim on a different factual basis.

We disagree with the State's interpretation of this statutory provision to the facts in this case. The State asserts that "[T]he direct appeal addressed the claim that 'the trial court erred in denying Carr's motion to dismiss the charges or the prosecutor due to prosecutorial misconduct and unfair prejudicial publicity'". However, that statement is actually just the "title" of Issue X in *Carr I*, and the specific prosecutorial misconduct addressed in that Issue X included: perceived violation by the District Attorney of court-ordered seal of discovery; that the D.A. made statements that were not based on the "whole story"; and that he made statements linking Carr to the crime without mentioning the "presumption of innocence." The State seems to argue that under § 99-39-21(2), since these specific acts were addressed under the issue of "prosecutorial misconduct" on direct appeal, then we are barred from now addressing "prosecutorial misconduct" post conviction, notwithstanding that the specific acts complained of are completely different acts. That is not a correct interpretation of § 99-39-21(2).

¶26.    Carr has failed to prove by a preponderance of the evidence that he is entitled to relief on the issue of prosecutorial misconduct for failing to provide trial counsel with exculpatory and impeachment material.

## III.    WHETHER TRIAL COUNSEL WAS INEFFECTIVE AT THE PENALTY PHASE OF CARR'S CAPITAL TRIAL.

¶27.    The standard of review for a claim of ineffective assistance of counsel involves a two part test: the defendant must prove, under the totality of the circumstances, that (1) his attorney's performance was defective and (2) the deficiency deprived the defendant of a fair trial. *Hiter v. State*, 660 So.2d 961, 965 (Miss. 1995). This review is highly deferential to the attorney, and there is a strong presumption that the attorney's conduct fell within the wide range of reasonable professional assistance. *Id.* at 965. With

14

respect to the overall performance of the attorney, "counsel's choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall within the ambit of trial strategy" and cannot give rise to an ineffective assistance of counsel claim. *Cole v. State*, 666 So.2d 767, 777 (Miss. 1995).

¶28. Anyone claiming ineffective assistance of counsel has the burden of proving, not only that counsel's performance was deficient but also that he was prejudiced thereby. *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Additionally, the petitioner must show that there is a reasonable probability that but for his attorney's errors, he would have received a different result in the trial court. *Nicolaou v. State*, 612 So.2d 1080, 1086 (Miss. 1992). Finally, the Court must then determine whether counsel's performance was both deficient and prejudicial based upon the totality of the circumstances. *Carney v. State*, 525 So.2d 776, 780 (Miss. 1988).

¶29. Carr claims his trial counsel was ineffective because: 1) counsel did not adequately present evidence of his mental retardation; 2) counsel did not begin to prepare for the sentencing phase until guilt had been decided; and, 3) counsel failed to make a record of all 'off-the-record' discussions.

### A. *Counsel failed to adequately present evidence of mental retardation.*[3]

¶30. Carr claims trial counsel failed to adequately present mitigating evidence of his mental retardation. Ron Lewis, Carr's trial counsel, made an oral motion to the trial court stating that Carr's constitutional rights would be violated under "the 8th Amendment and 14th Amendment as well as Article 3, Section 14

---

[3] This argument was put forth prior to *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), and *Chase v. State*, No. 2003-DR-01355-SCT (Miss. 2004) see infra, but is discussed here because it is illustrative of the insufficiency of pre-*Atkins* and pre-*Chase* hearings on mental retardation.

and 28 of the Mississippi Constitution" if the death penalty was imposed upon him because of his mental retardation. He also proffered the testimony of Dr. William Kallman in order to corroborate Carr's mental retardation. Trial counsel also called Carr's elementary school principal, who described Carr's school attendance, family life, and grades.

¶31. Carr's school counselor, Mr. Rencher, also testified to Carr's family life, grades, and standardized test scores. According to Rencher, Carr had very few disciplinary problems at school, and his problems all stemmed from his lack of attendance and his poor grades.

¶32. Dr. Kallman was a key witness put on by Carr during his sentencing phase. He testified to his personal evaluation of Carr's mental functioning level and placed Carr in the mildly mentally retarded range. Dr. Kallman stated that it was his opinion that Carr had a serious underlying psychotic condition. *Carr I*, 655 So.2d at 858. When responding to a question regarding how a person with that level retardation would function in the world at the age of twenty-five he responded, "Well, this person would have great difficulty functioning independently in the world unless it was a fairly simple task that did not require a lot of intellectual understanding and activity."

¶33. Trial counsel has no duty to present mitigating evidence. *Wiley v. State*, 517 So.2d 1373, 1379 (Miss. 1987). "Counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* Unlike defense counsel in *Wiggins*, 123 S.Ct. at 2542, who failed to investigate, discover, and present powerful mitigating evidence, Carr's trial counsel put forth significant mitigating evidence during the sentencing phase. We cannot say that trial counsel's decisions were unreasonable in this regard. This assignment of error is without merit.

> **B.      Counsel did not begin to prepare for the sentencing phase until guilt had been decided.**

16

¶34. As pointed out above, trial counsel called forth witnesses and presented the court with significant mitigating evidence, so obviously preparation had been made. There is no merit to this claim.

### C. Counsel failed to make a record of all 'off-the-record' discussions.

¶35. Carr admits in his petition that defense counsel filed a Motion to Require the Court Reporter to Transcribe the Entire Proceedings. Carr also contends that trial counsel failed to object to the off-the-record discussions. In order to preserve an issue for appeal, counsel must object. The failure to object acts as a waiver. *Oates v. State*, 421 So.2d 1025, 1030 (Miss. 1982). Furthermore, this issue was known before direct appeal and it is not now proper to bring before this Court. Miss. Code Ann. § 99-39-21(1). This assignment of error is both barred and without merit.

### D. Counsel failed to present evidence of an abusive childhood.

¶36. Carr offers the hearsay affidavit of an investigator who asserts a preliminary background investigation revealed claims of child abuse which Carr purportedly suffered. The failure to call available witnesses on critical issues is a factor to be considered in analyzing an ineffective assistance claim. *Leatherwood v. State*, 473 So.2d 964, 970 (Miss. 1985). The State responds that there is no specific allegation from any identifiable family member such that the claim's validity can be determined. Complaints of uncalled witnesses are typically not favored since presentation of testimony is generally a matter of trial strategy, *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981). Without knowing what specific evidence might have been given by a particular witness, it is impossible to say whether the failure to call such a witness amounted to ineffective assistance of counsel. Without an affidavit from the potential witness, it is speculative at best as to whether the testimony would have more likely than not altered the sentence imposed. *Brown v. State*, 749 So.2d 82, 91 (Miss. 1999). Carr has failed to prove that his trial counsel was ineffective.

## IV. WHETHER CARR'S CONVICTION FOR THE MURDER OF BOBBIE JO PARKER IS SUPPORTED BY SUFFICIENT EVIDENCE.

¶37. Carr claims the prosecution failed to establish that he killed Mrs. Parker or that the remains found in the charred Parker house were even hers. On direct appeal, in issue VII, Carr argued that evidence was insufficient to support the verdicts. *Carr I*, 655 So.2d at 837. Carr's argument in *Carr I* was a general insufficiency of the evidence argument, and this Court addressed it by reciting specific evidence which was the basis for the decision of the Court, and concluding that "the record reflects substantial evidence of such quality to support the verdict." *Id.* at 838. Thus to that extent, it is now procedurally barred. Miss. Code Ann. § 99-39-21(1)-(3). However, Carr now raises for the first time the issue that the prosecution failed to establish that the unidentified, charred body found in the Parker's home was Bobbie Jo Parker. However, Carr's argument that the prosecution "completely failed to provide any evidence that may have remotely linked the burnt body to that of Mrs. Parker" is specious. Although the medical examiner testified that he was unable to determine the age, race or sex of the victim, there was testimony that Mrs. Parker was missing and that the remains were found in her bedroom. Her engagement and wedding rings were positively identified after being found in the apartment of Carr's co-defendant. This Court has found that circumstantial evidence is sufficient to show that the person named in the indictment is the same as the person killed, if the circumstantial evidence is "clear and cogent and leaves no room for reasonable doubt." *Dooley v. State*, 238 Miss. 16, 116 So.2d 820, 821 (1960). In this case, there is no room for reasonable doubt that the fourth body found in the Parker's home was that of Bobbie Jo Parker. This issue is without merit.

## V. WHETHER THE JURY WAS IMPERMISSIBLY INFLUENCED BY EXTRANEOUS MATTERS.

18

¶38. "In any trial there is initially a presumption of jury impartiality." *United States v. O'Keefe*, 722 F.2d 1175, 1179 (5th Cir. 1983). In his supplemental application, Carr argues that the jury was improperly influenced during sequestration by the bailiffs. Carr asserts that the "bailiffs who would fraternize at card games with the jurors during sequestration, let it be known that Anthony Carr had allegedly threatened to 'come after the jurors' with the bailiffs' guns if he were found guilty." Carr also asserts that the same bailiffs told the jurors of a sexual predator staying at the same hotel who had victimized a pair of children whose ages were close to those of the Parker children. Carr claims that this information just recently came to light following interviews of all the jurors. Jurors are generally precluded from testifying to impeach their own verdict, however, "a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." M.R.E. 606(b). We have stated:

> Once an allegation of juror misconduct arises, then the next step is to consider whether an investigation is warranted. In order for the duty to investigate to arise, the party contending there is misconduct must make an adequate showing to overcome the presumption in this state of jury impartiality. Juror polling shall only be permitted by an attorney, outside the supervision of the court, upon written request.

> At the very minimum, it must be shown that there is sufficient evidence to conclude that good cause exists to believe that there was in fact an improper outside influence or extraneous prejudicial information.... Although a minimal standard of good cause showing of specific instances of misconduct is acceptable, the preferable showing should clearly substantiate that a specific, non-speculative impropriety has occurred.

*Gladney v. Clarksdale Beverage Co.*, 625 So.2d 407, 418 (Miss. 1993).

¶39. Carr submits the affidavits of eight jurors in support of his claim regarding the bailiff's actions, as well as his claim that matters not in evidence, i.e., carpet fibers from the Parker home found on Carr's boots, were considered. Upon learning of these affidavits, the State contacted the jurors who had been interviewed by Carr's counsel, and learned that the affiants felt that the affidavits obtained by Carr's counsel

19

were obtained under false pretenses. The State obtained new affidavits from six of the jurors who had signed the original affidavits for defense counsel. These "counter-affidavits" stated, in essence, that Carr's counsel or her investigator implied that they worked for the prosecution; that the jurors were deceived by the way the interview and original affidavits were presented; and that they would not have signed them had they known they were to be used in an effort to overturn Carr's conviction. The counter-affidavits indicate that the affiants had been led to believe that the original affidavits were prepared by Carr's counsel, and they were asked to sign them as documentation of the fact that the interviews had been conducted, and were not intended to be declarations of fact but only summaries of what was discussed. Given that these affidavits are contradictory and the initial statements have been recanted, it cannot be said that good cause exists to believe that the jury was improperly tainted by outside influences or matters not in evidence. Carr presents no factual evidence to support this claim. This issue is without merit.

## VI. WHETHER CARR IS ELIGIBLE FOR THE DEATH PENALTY PURSUANT TO *ATKINS v. VIRGINIA*.

¶40.    In *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), the United States Supreme Court determined that imposition of the death penalty on mentally retarded inmates constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The *Atkins* decision did not define who is or is not mentally retarded for purposes of eligibility for a death sentence but instead "leave[s] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." 122 S.Ct at 2250.

¶41.    Because Carr was sentenced pre-*Atkins*, the issue of his possible mental retardation was not scrutinized under the standard which *Atkins* imposed, nor under the standards we adopt today in *Chase v. State*, No. 2003-DR-01355-SCT (Miss. 2004).

¶42.    Carr's counsel argues he is entitled to a jury trial to determine whether he is mentally retarded. We disagree. Carr erroneously relies on the U.S. Supreme Court decision in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct 2428, 153 L.Ed.2d 556 (2002) which held unconstitutional a sentencing scheme where a judge rather than a jury determined whether there were sufficient aggravating circumstances to warrant imposition of the death penalty. In the present case, however, the death penalty has already been imposed by a jury after weighing both mitigating and aggravating evidence pursuant to Miss. Code Ann. § 99-39-101. And in *Foster*, we clearly stated that the issue of whether a defendant is mentally retarded such that he may not be executed under *Atkins* "will be considered and decided by the circuit court without a jury." *Foster*, 848 So.2d at 175. *See also* *Russell v. State*, 849 So.2d 95, 147-48 (Miss. 2003).

¶43.    The issue before this Court is whether Carr is ineligible for a death sentence which has already been imposed by a jury. Neither the trial court nor this Court has acknowledged him to be mentally retarded and the State challenges any such claim. Dr. Kallman's report was compelling, but left unanswered questions raised by *Atkins*.

¶44.    Notwithstanding the evidence which is before this Court regarding Carr's claim of mental retardation, we determine that under *Atkins* and the new standards set forth today in *Chase v. State*, No. 2003-DR-1355-SCT (Miss. 2004), we cannot constitutionally deny him the opportunity to present the issue of his possible mental retardation to the trial court. It is at the trial court that all the arguments presented by the State as well as those of Carr shall be heard and be weighed in accord with the standards and procedures set forth in *Chase*, and a final determination made as to whether Carr is mentally retarded and, thus, ineligible for the death penalty.

¶45.    We therefore grant Carr leave to proceed in the trial court for an evidentiary hearing to determine whether he is still eligible for the death penalty. Evidence from Dr. Kallman's prior evaluation of Carr may

21

be utilized in addition to new evidence presented. If in fact Carr is determined to be sufficiently mentally retarded to meet the criteria of *Atkins* and *Chase*, then the trial court should vacate the death penalty and resentence him accordingly.

## VII. WHETHER THE ALLEGED ERRORS TAKEN TOGETHER ARE CAUSE FOR POST-CONVICTION RELIEF.

¶46. This Court has recognized that several errors taken together may warrant reversal even though when taken separately they do not. *Flowers v. State*, 773 So. 2d 309, 334 (Miss. 2000). This Court has recently clarified and reaffirmed this principle in *Byrom v. State*, 863 So.2d 836, 847 (Miss. 2004), in which we stated that "upon appellate review of cases in which we find... any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis as to whether such error or errors... may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect." We find that only one issue (the *Atkins* claim) warrants an evidentiary hearing. However, we find no other alleged errors that warrant post-conviction relief.

## CONCLUSION

¶47. We grant Carr's application in part to the limited extent that he is granted leave to seek post-conviction relief in the trial court on his *Atkins* claim in accordance with *Atkins* and *Chase*. We deny Carr's application in all other respects.

¶48. **APPLICATION FOR LEAVE TO SEEK POST-CONVICTION RELIEF GRANTED IN PART AND DENIED IN PART.**

**SMITH, C.J., WALLER, P.J., GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. DIAZ AND CARLSON, JJ., NOT PARTICIPATING.**